William A. LESTER, Trustee for the Bankrupt Estate of Daniel E. Harper and Daniel E. Harper, Plaintiffs,

v.

The RESOLUTION TRUST CORPORATION as Receiver for Arlington Heights Federal Savings and Loan Association, Defendant.

No. 89 C 9076.

United States District Court, N.D. Illinois, E.D.

March 8, 1991.

---

· J. Stephen Walker, Walker, Suriano & Associates, Terry Rose Saunders, Susman, Saunders & Buehler, Chicago, for plaintiffs.

Robert R. Hall, Jr., William J. McKenna, Jr., Paul K. Vickery, Hopkins & Sutter, Chicago, for defendant.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

### Introduction

The Resolution Trust Corporation ("RTC") as receiver for Arlington Heights Federal Savings and Loan Association ("Arlington"), removed this case from the 18th Judicial Circuit Court, DuPage County, Illinois, pursuant to Title 12, U.S.C. §§ 1421 et seq., the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA").[1] Removal was authorized pursuant to § 501(b). Initiation of the state court action was authorized by a bankruptcy judge of this court on August 28, 1981 as a complaint by William A. Lester, trustee for the bankrupt estate of Daniel E. Harper (*In Re: Daniel E. Harper, Debtor*, 78 B 3406). While the case was still in state court, a jury verdict was returned in favor of the trustee and against Arlington in the amount of $18,645,000 on November 18, 1989. Arlington filed a timely motion for judgment notwithstanding the verdict and for a new trial on December 7, 1989.

At the close of business on December 7, 1989, the Director of Thrift Supervision of the Department of the Treasury determined that Arlington was insolvent and appointed the RTC as receiver. RTC is a proper party to this action. FIRREA, §§ 212(d), 501(b)(4). RTC may remove an action to this court so long as it is appealable. FIRREA § 212(a)(13)(B).

After removal, the record of the state court proceeding was filed in this court. The parties were permitted to file briefs and the case is before this court for a decision on post-trial motions. RTC moves, as did Arlington, for judgment notwithstanding the verdict or, in the alternative, for a new trial. The resolution of the motions has required this court to examine the trial record before the state court.

The parties have not specifically addressed the question of whether Illinois or federal law governs the resolution of the motions. Both parties have, however, assumed that Illinois law provides the substantive law for this case. Accordingly, the court will apply Illinois law. *Shore v. Dandurand*, 875 F.2d 656, 659 (7th Cir. 1989).

### Nature of the Claims

The complaint on which this case went to trial on behalf of the trustee alleges in Count I that on or about July 26, 1974, Arlington issued a $3,832,000 loan commitment to Donald E. Harper which was a legal and binding contract; that Harper performed the conditions required of him; that Arlington failed and refused to fund the loan; and that as a result Harper was damaged. Count II alleges that the breach of contract was willful, intentional, and vexatious in utter disregard for contractual rights. Arlington filed a counterclaim against both Lester and Donald E. Harper for a declaratory judgment that Harper had failed to perform a loan agreement requiring payment of a commitment fee in the amount of $76,640. Prior to trial, Ar-

1. The suit removed was originally filed in the state court as 81 L 1135 and later refiled or renumbered 85 L 1206.

lington dropped its claim against the trustee and Harper.

On the first day of trial, Harper was allowed to enter the suit individually and to file, over the objection of Arlington, a $20 million fraud claim. Harper alleged that Arlington intended to deceive and defraud him and to encourage his subcontractors and other lenders to believe that Arlington was committed to fund his entire project, even though Arlington never had the intention or ability to fund the project.

After trial, but before submitting the case to the jury, the trial court dismissed Count II, the intentional breach of contract claim. The jury returned a verdict in favor of the trustee and against Arlington on Count I in the amount of $18,654,000 and in favor of Arlington and against Harper on Harper's fraud claim.

RTC moves for judgment notwithstanding the verdict on the grounds that the procurement of other lender participants was a condition precedent to its funding the loan and that Arlington sought and could not find participants interested in a 10.5% loan because interest rates were at a 12–13% level, and therefore it was not legally bound to make a loan. RTC contends, in the alternative, that only nominal or no damages should be allowed because of a failure of proof. RTC also contends, in the alternative, that a new trial should be granted because the trial court (1) erroneously allowed Harper to present and offer proof in support of an alleged $20 million fraud claim; (2) permitted Arlington to present proof in support of an invalid intentional breach of contract tort claim; and (3) permitted proof of total damages between $64 and $93 million dollars on phases of Harper's construction which were not part of its July 26, 1974 commitment sued on in Count I.

### Discussion

The standard for review of a motion for a directed verdict and for judgment not-

withstanding the verdict requires the court to consider all the evidence together with all reasonable inferences in the light most favorable to the plaintiff. *Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1307 (7th Cir.1985); *Hannigan v. Sears, Roebuck & Co.*, 410 F.2d 285, 287 (7th Cir.), *cert. denied*, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178 (1969).[2]

Beginning in 1970, Harper planned to develop a shopping mall in Lake Zurich, Illinois. The mall was to be constructed in three phases on six different lots. Phase I was to be a strip mall consisting of shops and a fire station on lots four and six. Phase II was to be an enclosed mini-mall and a service station on lots one and seven. Phase III was a contemplated development on lots two and three consisting of a bank, a restaurant, office space, and a library. On February 16, 1973, Arlington made a one-year commitment (later extended to August 16, 1974) to loan Harper up to $5.3 million at 9.5% for 15 years provided that 60% of the Phase I shops were under contract for sale as condominium ownership units. It is undisputed that Harper was unable to proceed with a condominium development and instead proceeded to seek lessees for the Phase I units.

On June 28, 1973, Harper entered into a one-year loan agreement (later extended to October, 1974) with McElvain–Reynolds to provide $2.3 million to finance land acquisition and to construct improvements for the mall project. Harper also obtained a $2.3 million standby commitment from Glen Ellyn Savings and Loan. Construction was underway during the summer of 1974 on Phase I of the mall.

On July 26, 1974, Arlington made a one-year commitment to loan Harper $3,832,000 at an interest rate of 10.5% for a term of 15 years subject to a condition of loan participation which provides as follows:

---

**2.** Since both parties refer to the federal judgment n.o.v. standard, it is assumed the federal standard, not the state standard, is the proper standard to apply. But even if the state standard were applied, the result would be the same. *See Cross v. American Country Insurance Co.*, 875 F.2d 625, 630 (7th Cir.1989) (quoting *Pedrick v. Peoria & Eastern R.R.*, 37 Ill.2d 494, 229 N.E.2d 504, 513–14 (1967)) (evidence viewed in light favorable to nonmovant overwhelmingly favors movant).

10. Loan participation: Because of the high dollar amount of the loan requested, it will be necessary to secure additional lending institutions as loan participants. The Association reserves the right to select such loan participants.

The loan is described as a construction loan on Zurich Town Mall, lots Nos. 4 and 6, Lake Zurich, Illinois.

The loan was made subject to an appraisal by a member of the American Institute of Real Estate Appraisers. The amount of the loan could not exceed 75% of the appraised valuation. The appraisal of Phase I shows lots 4 and 6 to constitute 482,533 square feet. Phase I construction was to occupy 143,500 square feet and consist of a single structure divided into five buildings by interior walls with one of the five divided into a fire station and mall. The balance of the land was to include a parking lot landscaped with trees and shrubs and drained toward a retention pond. On a direct cost approach, land was valued at $1,125,000 and improvements (including direct and indirect costs) were valued at $3,982,000 totalling $5,107,645. Using an income approach, the appraiser assumed that economic rent would produce annual net rent of $580,000 which, capitalized at a rate of 10.73%, indicated a value of $5.1 million. A third approach, assuming a fifteen-year holding period at a 10.5% debt rate with 25% equity ($1,278,000) earning 10%, would indicate an overall rate of 10.33% and a property value of $5,331,177.[3]

During the summer of 1974, interest rates rose rapidly to the 12–13% level. On August 8, 1974, Arlington informed Harper that it could not fund the July 26, 1974 commitment because of lack of other lender interest in a 15–year 10.5% loan. Arlington's witness testified that, with Harper's approval, it sought participants at a loan rate of 14%. Arlington also agreed to purchase other property in which Harper had an interest in order to help him obtain cash. Construction on the mall stopped during October, 1974.

On November 25, 1974, Arlington notified Harper in writing that it had obtained expressions of interest from several lending institutions with funds available for a three-year construction loan at 14%. Arlington told Harper that a permanent takeout loan commitment in the amount of $3,832,000 would be necessary. Ultimately, Harper lost the mall and other properties in foreclosure proceedings. A petition for bankruptcy was filed by Harper in 1978. On August 28, 1981, the trustee received court approval to file suit against Arlington.

*Judgment Notwithstanding the Verdict*

■ At the trial of this case, the trustee and Harper took the position that Arlington could not enforce the other lender participation precondition because Arlington did not look for other lenders to participate in a loan at a 10.5% interest rate. Witnesses for Arlington were unable, on cross-examination, to specify exactly who was asked and who declined to participate in the July 26, 1974 commitment between July 26 and August 8, 1974, when Harper was first told that other lenders would not participate because interest rates had risen to the 12–13% level. Although it may be true that no lender would in fact have been interested in a 10.5% loan, Arlington had a duty under the contract to seek participants before informing Harper that the loan could not be made because of lack of other participants. If the jury was convinced that no effort was made to obtain participants at the 10.5% level, Arlington would not be entitled to insist on performance of this precondition and would be bound by its commitment. It was an issue at the trial whether or not Arlington even sought other participants. Since, on this record, there is some evidence to support the jury's finding of liability, the court cannot grant a judgment notwithstanding the verdict for RTC on the issue of liability.

*The Motion for a New Trial*

■ On the motion for new trial, defendant cites the federal standard and plaintiff

---

**3.** All appraisal methods require a substantial equity investment. Arlington disputed whether Harper ever made or was able to make a substantial equity investment in Phase I.

cites the Illinois standard. In diversity cases, this court applies the federal standard for granting a new trial. *Wassel v. Adams*, 865 F.2d 849, 854 (7th Cir.1989). The present case is not a diversity case, but is before the court because there is federal jurisdiction over cases involving the RTC. The parties, though, agree that Illinois law provides the substantive law for this case. In any event, a motion for a new trial is procedural in nature and therefore the federal standard would appear to govern. *See id.* This case, however, is in an unusual posture. The trial occurred in state court and the case was removed after the new trial motion was filed in state court, but any new trial will occur in federal court. While it is still likely that the federal rule applies, it is unnecessary to resolve the question of which law is applicable. Under either standard, granting a new trial would be appropriate for the reasons set forth below. *See Forrester v. White*, 846 F.2d 29, 31–32 (7th Cir.1988); *Benuska v. Dahl*, 87 Ill.App.3d 911, 43 Ill.Dec. 249, 251, 410 N.E.2d 249, 251 (1980); *Krum v. Rogers*, 301 Ill.App. 631, 22 N.E.2d 970 (1939).

 The sole claim made by the trustee was that Arlington breached (or tortiously breached) a contract to lend money for Phase I construction pursuant to the July 26, 1974 commitment. Nevertheless, the trustee and Harper were allowed to press contract and tort claims for Phase II and Phase III losses. A witness for plaintiff was allowed to express an opinion that damages were between $64 and $93 million. The opinion was essentially unexplained. *See Mid–State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333, 1339–40 (7th Cir.1989).

Under Illinois law, the measure of damages for wrongful failure to loan money is the higher cost of alternative financing unless it is foreseeable to the lender that substitute financing will not be available. (Arlington contended that substitute financing was available.) If it is foreseeable that substitute financing will not be available, the lender is liable for foreseeable actual damages resulting from the breach. *Hill v. Ben Franklin Savings & Loan Ass'n*, 177 Ill.App.3d 51, 126 Ill.Dec. 462, 468, 531 N.E.2d 1089, 1095 (2d Dist.1988); *Restatement (Second) of Contracts*, § 351, comment (e). Here, the cost of alternate financing was the difference between the loan rate of 10.5% and 14% for 15 years (approximately $200,000). However, if it was foreseeable to the lender that substitute financing would be unavailable, damages based on the $5.1 million appraised value of Phase I less saved costs, would be appropriate. Given the appraisal data there was no basis for presenting the jury with damage calculations of $64 to $93 million with respect to Count I. How or on what basis the jury arrived at a damage figure of $18.6 million, the trustee simply does not say.

The trustee was authorized by the bankruptcy court to file "a complaint." Harper's fraud action against Arlington became a part of the debtor's estate in bankruptcy, and only the trustee could press such a claim. 11 U.S.C. § 541; *Henderson v. Binkley Construction Co.*, 74 F.2d 567, 569 (7th Cir.1935); *Moore v. Slonim*, 426 F.Supp. 524, 526 (D.Conn.), *aff'd by unpublished order*, 562 F.2d 38 (2d Cir.1977). Harper should not have been permitted to file a $20 million fraud action on the eve of trial. It is impossible to sort out what evidence related only to Count I and what related to the tort and fraud counts. The undifferentiated damage evidence may well have produced the jury's unexplained verdict on Count I. Accordingly, a new trial must be ordered.

Presumably the prosecution of this claim on the part of the trustee is the only item remaining in Harper's very old bankruptcy proceeding. Harper has been discharged. The bankruptcy judge who authorized suit has retired. Good cause exists to withdraw the supervision of this claim and any matter relating to possible settlement, fees, or costs in connection with the claim from the bankruptcy court to this court pursuant to 28 U.S.C. § 157(d). Supervision of the distribution of any recovery will be under the direction of the bankruptcy court on remand from this court.

IT IS THEREFORE ORDERED as follows:

(1) The motion of Resolution Trust Corporation for judgment notwithstanding the verdict is denied.

(2) The motion of Resolution Trust Corporation for a new trial is granted. The jury's verdict in the amount of $18,645,000 is hereby vacated, and a new trial on liability and damages with respect to Count I will be conducted before this court.

(3) All matters relating to the trustee's prosecution of a claim in bankruptcy proceeding *In re: Daniel E. Harper, Debtor*, 78 B 3406 (N.D.Ill.), are withdrawn from the United States Bankruptcy Court to this court for hearing with this case.