JOHN KOCHAN *et al.*, Plaintiffs-Appellees, v. OWENS-CORNING FIBER-GLASS CORPORATION, Defendant-Appellant.

Fifth District   No. 5—91—0191

Opinion filed February 23, 1993.

Raymond R. Fournie and Thomas B. Weaver, both of Armstrong, Teasdale, Schlafly & Davis, of St. Louis, Missouri, for appellant.

Brent M. Rosenthal, Diane M. Andrew, Steven D. Wolens, and Brian D. Weinstein, all of Baron & Budd, P.C., of Dallas, Texas, for appellees.

JUSTICE LEWIS delivered the opinion of the court:

These five first-named plaintiffs (and the wives of four of them) and four others brought actions against defendant, Owens-Corning Fiberglass (OCF), and several other defendants to recover damages for personal injury resulting from plaintiffs' exposure to asbestos-containing products. All defendants, except OCF, settled with plaintiffs just after the trial began. The jury returned verdicts in favor of plaintiffs named in this appeal and against the other four. Defendant appealed.

Defendant makes 10 arguments on appeal: (1) the trial court erred by precluding defendant from introducing evidence that plaintiffs were exposed to asbestos-containing products manufactured by other companies not present at trial; (2) the trial court erred by denying its motion for change of venue; (3) the trial court erred in submitting the issue of punitive damages to the jury; (4) the punitive damage awards were excessive; (5) the punitive damage awards violated defendant's procedural and substantive due process rights; (6) the trial court erred by allowing plaintiffs' expert to read into evidence the underlying data and information on which he based his opinion; (7) the trial court erred in permitting plaintiffs' counsel to read into evidence only a portion of an answer given by Herman Davis at his deposition; (8) the trial court erred by admitting an exhibit which referred to a prior unrelated settlement; (9) plaintiffs Reneau, Granger and Davis failed to

offer sufficient evidence to allow recovery for fear of cancer; and (10) the judgment should be reduced to reflect the amount of settlements paid by settling defendants. We affirm in part and remand in part.

OCF bought the Kaylo Division of Owens-Illinois Glass Company in 1958 and began manufacturing Kaylo, an industrial heat-insulation product. Asbestos made up 15% of the contents of Kaylo. Defendant maintained that it began putting warning labels on Kaylo in 1966, after the development of information that asbestos might pose risks to end-users of products containing small percentages of asbestos. Defendant ceased making Kaylo in 1972.

Plaintiffs presented evidence that defendant had information regarding the dangers of asbestos through the 1940's and 1950's and knew by 1963 that it was dangerous to a person's health. (It is not clear from the evidence why defendant received this information as to the dangers of asbestos in the 1940's and 1950's prior to its purchase of the Kaylo Division in 1958, but there was no dispute that defendant had such information.) Plaintiffs also presented evidence that defendant did not begin putting warning labels on Kaylo until 1970.

Four of the five plaintiffs were exposed to Kaylo while working at the Standard Oil/Amoco plant in Wood River, Illinois. One plaintiff was exposed to Kaylo at the General Steel plant in Granite City, Illinois.

Clarence Granger worked at the Amoco plant from 1942 to 1974 as a laborer and then as an insulator removing and replacing pipe covering and insulation. He testified that he worked with Kaylo many times from the 1940's through the 1970's. He cut Kaylo a lot of times, and it was dusty when he sawed it. He never saw warnings on Kaylo indicating that it was dangerous to his health or that he should take precautions when using it.

John Kochan worked a variety of jobs at Amoco between 1945 and 1981, and he worked around Kaylo on a frequent basis in the 1960's. He cleaned up asbestos when he was a laborer. When he worked as a machinist, he sometimes worked on a pump while the insulators were covering a new line overhead. As the insulators cut the insulation, dust came down so thickly that it looked like snow, causing Kochan to don goggles to keep it out of his eyes. He also delivered Kaylo as a truck driver. He never saw any warnings on Kaylo.

Harry Reneau worked at Amoco from 1945 to 1982 primarily as a welder, but briefly as a laborer and a pipefitter's helper. As a welder, he removed insulation from pipes many times. He also worked around insulators who were cutting and putting on insulation. He saw many

boxes of Kaylo at the plant, adding that it was "the largest supplier *** in the refinery."

Herman Davis worked at Amoco as a crane operator from 1944 through 1984. He worked around insulators who used Kaylo. Dust would fly everywhere when the insulators cut the pipe covering. In the summer months, the fan in the cab of the crane would suck the dust through the cab in such a volume that he was covered. During the early 1960's through the late 1970's, he used the bucket of the crane to remove insulation. Dust would also blow all over him when he cleaned out the ash pits that were filled with insulation. He testified that he worked around Kaylo all the years he was at the plant. He even recalled seeing boxes of Kaylo in the plant as late as 1983. There were no warnings on the boxes at any time indicating that they contained asbestos.

Clarence Woodward was exposed to Kaylo while working at the General Steel plant in Granite City, Illinois, from 1941 through 1971. As a laborer, he cleaned up after the insulators, picking up asbestos or whatever was on the floor. Although he could not personally identify the brand names of the insulation materials, a co-worker, Victor Welch, testified that he worked with Kaylo around Woodward in the 1960's, that Kaylo was all over the General Steel plant, and that Kaylo was used in 10 of the buildings where Woodward worked. Kaylo was the insulation used the most by insulators at General Steel.

Asbestosis, a type of pneumoconiosis, which is a lung condition resulting from inhalation of certain dusts, is caused by inhalation of asbestos dust. Inhaled asbestos particles are deposited in the lung tissue, and with sufficient exposure, and after an extended latency period, the asbestos particles may result in scarring and possible impairment in the functioning of the lung. Asbestosis is progressive and incurable.

Plaintiffs' experts testified that the development of an asbestos-related condition is a cumulative process and that each dose contributes to the risk of asbestosis. Dr. Miles Yanta testified that each exposure to asbestos was a substantial contributing factor in causing asbestosis. He also acknowledged on cross-examination that there must also be a certain amount of exposure before a person will contract asbestosis, but he did not know what that threshold exposure was.

Both parties presented expert medical testimony regarding the medical condition of each plaintiff. Although defendant offered contradictory testimony, each plaintiff presented testimony that he suffered from asbestosis. Defendant does not raise any issue regarding the in-

juries suffered; therefore, we will discuss only that portion of the extensive medical testimony necessary to resolve the issues presented. .

Plaintiffs offered evidence of defendant's knowledge that its asbestos-containing products were potentially hazardous to end-users. Over defendant's objection, Dr. Joseph Wagoner, an epidemiologist, testified that it was established that exposure to asbestos was linked to asbestosis by 1930 and linked to cancer by 1955. Dr. Wagoner cited various articles and was allowed to testify as to the substance of each article. He also testified to several other articles which should have put defendant on notice of the hazards of asbestos. Plaintiffs also presented several intraoffice memoranda, which we will summarize later in this opinion, which indicated that defendant became aware of the dangers of asbestos in the 1940's.

The jury returned verdicts for these five plaintiffs, awarding $1 million in punitive damages to each of them, plus damages for disability and past and future pain and suffering.

### I. EVIDENCE OF OTHER MANUFACTURERS' ASBESTOS PRODUCTS

Defendant argues that the trial court erred in excluding evidence that plaintiffs had been exposed to other asbestos-containing products manufactured or distributed by companies other than OCF. We disagree.

In 1986, there were thousands of asbestos cases filed in Madison County, to which Judge Chapman was assigned to oversee. Judge Chapman entered a blanket order in 1988 ruling on various motions *in limine.* Relying on *Lipke v. Celotex Corp.* (1987), 153 Ill. App. 3d 498, 505 N.E.2d 1213, *appeal dismissed* (1989), 536 N.E.2d 71, he granted the plaintiffs' motion *in limine* to exclude any evidence that plaintiffs had been exposed to asbestos-containing products manufactured by other parties not parties to the case at the time of the trial. The trial judge in this case also relied on *Lipke* in denying defendant's motion to reconsider Judge Chapman's ruling. Defendant claims that the court's reliance on *Lipke* was error.

In *Lipke,* an asbestos case, the defendant denied that the plaintiff was exposed to its product. One of the defendant's arguments on appeal was that the trial court wrongfully excluded evidence of plaintiff's exposure to other asbestos products. That court noted that there can be more than one proximate cause of an injury and stated:

> " 'In such a situation, one guilty of negligence cannot avoid responsibility merely because another person is guilty of negligence contributing to the same injury ***.' (*Sears v. Kois Brothers Equipment, Inc.* (1982), 110 Ill. App. 3d 884, 889, 443

N.E.2d 214, *appeal denied* (1982), 93 Ill. 2d 548.) Under *Romine v. City of Watseka* (1950), 341 Ill. App. 370, 377, 91 N.E.2d 76, where such guilt exists, 'it is no defense that some other person, or thing contributed to bringing about the result for which damages are claimed. Either or both parties are liable for all damages sustained.' Thus, the fact that plaintiff used a variety of asbestos products does not relieve defendant of liability for his injuries. Evidence of such exposure is not relevant." *Lipke*, 153 Ill. App. 3d at 509, 505 N.E.2d at 1221.

Defendant asserts that there are two elements to proximate cause; actual cause, or cause in fact, and legal cause. Cause in fact is determined by simply analyzing the facts. Two tests are used when considering cause in fact: the "but for" test, where a defendant's conduct is not a cause if the event would have occurred without it; and the "substantial factor" test, in which a defendant's conduct is a cause "if it was a material element and a substantial factor in bringing the event about." (*Thacker v. U N R Industries, Inc.* (1992), 151 Ill. 2d 343, 354-55, 603 N.E.2d 449-55.) Once it is found that defendant's conduct was a cause in fact of the injury, the next question is whether defendant's conduct was the legal cause, *i.e.*, whether the defendant should be held legally responsible for the actual consequences of his conduct. *Turner v. Roesner* (1990), 193 Ill. App. 3d 482, 490, 549 N.E.2d 1287, 1292-93, *appeal denied* (1990), 132 Ill. 2d 555, 555 N.E.2d 386.

Defendant argues that its conduct was not a cause in fact of plaintiffs' injuries and asserts that the evidence of other exposures to other products was necessary and should have been admitted because the jury could not make the initial determination of cause in fact unless it knew of all other exposures. Defendant's position is that *Lipke* does not apply to exclude evidence of exposures to other manufacturer's products when cause in fact is disputed, but rather, it applies only to the second prong of proximate cause, legal cause.

Although it appears that the defendant in *Lipke* was arguing that it was not a cause of the injury, the court's holding appears to pertain to cases in which cause in fact has already been proven; that where it has already been proven that one defendant is a cause in fact, that defendant cannot introduce evidence of another's negligence in order to relieve it of legal cause and thus liability. We, nevertheless, conclude that the holding in *Lipke*, that evidence of exposure to other asbestos-containing products is not relevant, applies in cases in which actual cause or cause in fact is disputed.

Our courts recognize that it is impossible to determine whether a specific exposure or even several exposures to a particular asbesto product caused or contributed to the cause of the injury. On the othe hand, it is equally impossible to find that a specific exposure or sev eral exposures did not cause or contribute to the injury. Proof of cau sation is further complicated by the extended time period of mor than 25 years for the asbestos injury to manifest itself. Because c these difficulties in proof of causation in asbestos cases, our suprem court adopted the "frequency, regularity and proximity" test, whic has been characterized as the *"de minimus"* rule. *Thacker*, 151 Ill. 2 at 358-59, 603 N.E.2d at 457.

Allowing a defendant to present evidence of a plaintiff's expc sures to other products whose manufacturers are not defendants i the trial would only confuse the jury, with a possible result that defendant could be unjustly relieved of liability. The purpose for whic the evidence is offered is inconsequential, for the effect is the same the shift of blame to another manufacturer.

On the other hand, a plaintiff might incur a risk by not introduc ing the evidence of other exposures, because, if the evidence show only a minimal exposure to defendant's product and no other expc sure to asbestos, plaintiff's expert may look foolish testifying tha such minimal exposure caused a pneumoconiosis that must have bee caused by asbestos. Plaintiff would also be subject to the *"de mini mus"* rule, which may result in a directed verdict against him. I plaintiff attempts to bolster his or her expert's opinion by showing plaintiff's exposure to other manufacturers' products and arguing th cumulative effects of asbestos exposure, then plaintiff would be open ing the door to defendant's argument that it was plaintiff's exposur to other products that caused plaintiff's injury.

Defendant could have negated liability without introducing evi dence of exposure to other asbestos products simply by showing, fo example, that plaintiff was not exposed to its products, that exposur to its products was insufficient to cause injury, or that its product con tained such a low amount of asbestos that it could not have been cause of the injury. The question for the jury to consider, with o without evidence of exposures to other products, is the same: whethe the evidence against the particular defendant at trial was sufficient t find that particular defendant's product was an actual cause or caus in fact of plaintiff's injury.

■ Plaintiffs' burden was to show that defendant's conduct was substantial factor in causing the alleged injury. (*Thacker v. U N R In dustries, Inc.* (1992), 151 Ill. 2d 343, 603 N.E.2d 449; *Wehmeier v*

*U N R Industries, Inc.* (1991), 213 Ill. App. 3d 6, 572 N.E.2d 320.) In the case at hand, after reviewing all the evidence, we conclude there was sufficient evidence for the jury to reasonably find this defendant liable. Each of the plaintiffs suffers from asbestosis. Dr. Yanta testified that each exposure to asbestos was a substantial factor in causing the asbestosis. There was testimony that Kaylo was used more than any other product and not only frequently but almost daily at Amoco and General Steel, and that each plaintiff worked with or was in close proximity to Kaylo on a regular basis for several years. We do not have to be concerned about the *"de minimus"* rule or the fiber-drift question present in the *Thacker* case, as there was substantial evidence showing that plaintiffs were frequently, regularly, and proximately exposed to Kaylo. (*Thacker v. U N R Industries, Inc.* (1992), 151 Ill. 2d 343, 603 N.E.2d 449.) Once the plaintiffs established that defendant's product was a substantial factor in causing their injuries, the allowance of evidence of plaintiffs' exposures to products manufactured by nonparties would have improperly allowed defendant to attempt to shift the blame of its negligence to another party or to create confusion in the jurors' minds.

Finally, we note that recently the United States Court of Appeals, Seventh Circuit, in *Tragarz v. Keene Corp.* (7th Cir. 1992), 980 F.2d 411, agreed with our interpretation of *Lipke* that evidence of exposures of plaintiff to other manufacturer's products is not relevant in determining whether exposure to defendant's product was a substantial factor in causing plaintiff's injury.

## II. CHANGE OF VENUE

Defendant argues that the trial court erred by denying its "motion for change of judge" pursuant to section 2—1001(a)(2) of the Code of Civil Procedure. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1001(a)(2).) Under that statute, if a motion is timely and in proper form, the right to change of venue is absolute and the trial court has no discretion to deny the motion. (*Rosewood Corp. v. Transamerica Insurance Co.* (1974), 57 Ill. 2d 247, 311 N.E.2d 673.) A motion is untimely if it is brought after a hearing on the merits has started or the trial court has ruled on a substantive issue in the case. (*Frede v. McDaniels* (1976), 37 Ill. App. 3d 1053, 347 N.E.2d 259.) "The timeliness requirement prevents a party from determining the trial court's attitude toward issues in the case, then switching judges." *Heman v. Jefferson* (1985), 136 Ill. App. 3d 745, 751, 483 N.E.2d 537, 542.

As we mentioned previously, there were thousands of asbestos cases filed in Madison County. All of the plaintiffs in these cases were

represented by four separate law firms. Judge Riley, assigned to help manage all these cases, entered a standing order which standardized pleading, regulated discovery, and set forth standards for nonexpert and expert disclosures in all asbestos litigation.

The trial judge in this case, Judge Maag, was assigned to assist Judge Riley on April 7, 1989. He assisted Judge Riley in hearings on proposed changes in the standing order and participated in the decision on a supplement to the standing order, which limited the parties in redeposing co-workers who had been deposed as plaintiffs in other asbestos cases.

On August 30, 1989, W.R. Grace and Company, another defendant, filed a motion for clarification and sanctions in all pending asbestos cases in which plaintiffs were represented by Baron and Budd, the plaintiffs' attorneys in this case. Judge Maag ruled on this motion on January 3, 1990.

On January 4, 1990, defendant filed its motion for change of judge from Judge Maag "in all Madison County Illinois asbestos cases in which [OCF] is a defendant." The motion applied to "all asbestos litigation filed by Baron and Budd." Judge Maag denied the motion because he had previously ruled on the motion for clarification and sanctions, which he considered a substantive issue in all cases to which the motion applied.

Defendant raised the issue again in its post-trial motion. The trial judge denied the motion, citing his participation in rulings on the standing order and its supplements and various other issues in other asbestos cases pending in Madison County.

Defendant claims that the motion for clarification and for sanctions pertained only to discovery and the ruling on that motion did not require the court to consider, evaluate or weigh any substantive issues of these lawsuits. Defendant cites *Becker v. R.E. Cooper Corp.* (1990), 193 Ill. App. 3d 459, 550 N.E.2d 236, *Stoller v. Paul Revere Life Insurance Co.* (1987), 163 Ill. App. 3d 438, 517 N.E.2d 5, and *In re Marriage of Birt* (1987), 157 Ill. App. 3d 363, 510 N.E.2d 559, *appeal denied* (1987), 116 Ill. 2d 556, 515 N.E.2d 101, in support of its argument. These three cases are distinguishable from the case at hand because: in *Becker*, the trial judge only presided over a pretrial conference in which no ruling was made; in *Stoller*, the trial judge made general discovery rulings, set dates for interrogatories and the trial, and required submission of a witness list; and in *Birt*, the judge was sitting in on motions for another judge who was assigned to hear the case and he merely limited discovery by nonparties to the action.

■■ In the case at hand, however, the trial judge's ruling on the motion for clarification and for sanctions was a ruling on a substantive issue, and defendant was not entitled to a change of judge under section 2—1001. This ruling entailed more than mere administrative or ministerial discovery rulings. Judge Maag's ruling pertained to evidentiary matters, including the questions a defendant could ask a plaintiff co-worker as to what products a plaintiff worked with and what impeachment defendant would be allowed at trial by use of the depositions, and he ordered parties to allow a witness to answer questions subject to objection. Thus, the trial judge limited the scope of inquiry and possible impeachment of plaintiff co-workers at the trial with respect to product identification, and he made known his interpretation of Supreme Court Rule 212(c) (134 Ill. 2d R. 212(c)), involving the partial use of depositions for impeachment at the trial.

Furthermore, in light of the above, we believe that the judge's ruling on the motion for sanctions against Baron and Budd was a substantive ruling. See *Perimeter Exhibits, Ltd. v. Glenbard Molded Binder, Inc.* (1984), 122 Ill. App. 3d 504, 461 N.E.2d 44; *Dolido v. Zenith Radio Corp.* (1990), 194 Ill. App. 3d 268, 550 N.E.2d 1225.

Since we find that the above were rulings on substantive issues, we need not consider whether the trial judge's participation in the ruling regarding the supplement to the standing order was a substantive issue.

### III. PUNITIVE DAMAGES

The jury awarded $1 million in punitive damages to each of the five plaintiffs. Defendant raises several issues regarding those punitive damages.

#### A. INSUFFICIENT EVIDENCE

Defendant argues that the trial court erred in submitting the issue of punitive damages to the jury because each plaintiff failed to establish the elements necessary for an award of punitive damages.

Punitive damages can be awarded when the tort was "committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully or with a such gross negligence as to indicate a wanton disregard for the rights of others." *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 186, 384 N.E.2d 353, 359.

Defendant argues that the punitive damage awards should be vacated because there was no evidence that defendant acted with outrageous, willful or wanton conduct in not warning plaintiffs of the danger of asbestos when it marketed Kaylo. Defendant asserts that

plaintiffs' evidence established only that defendant was generally aware of developing medical literature that asbestos could cause health problems and did not establish that defendant had knowledge of health hazards associated with endusers or bystanders. We disagree.

■■ Medical literature existed, as early as 1899, concerning the hazards of asbestos. Defendant was a subscriber to many journals which contained articles on the dangers of asbestos. Several office memoranda (portions of which are set out below) indicated that defendant began compiling information on the hazards of asbestos as early as the 1940's and 1950's.

Memoranda introduced indicated that in 1940 defendant was encountering difficulty marketing its fiberglass insulation products because the insulation workers' union feared that fiberglass might be hazardous. Those documents, while highlighting the positive aspects of fiberglass, indicated defendant's awareness of the hazards of asbestos.

> Memo dated January 30, 1940:
> " [S]ome of these other materials are known to develop industrial diseases that we do not find present in the handling of fiberglass (such as asbestosis and possibly silicosis). Most of these other products are very dusty compared to fiber glass."

> Memo dated January 20, 1941:
> "Thanks so much for your letter of January 17. It is indeed good news to hear that you do not feel you will encounter any evidence of an asbestos-like reaction since none of the fiber reaches the lungs."

> Memo dated May 15, 1941:
> "I feel quite positive that we are not going to encounter any evidence of an asbestos-like reaction because none of the fiber reaches the interior of the lungs."

In order to combat the union's fear that fiberglass was harmful and to successfully market their product, defendant intended to publicize the hazards associated with asbestos:

> Memo dated January 7, 1942:
> "Gather as a weapon-in-reserve an impressive file of photo stats of medical literature on asbestosis. Available are two bibliographies covering medical literature to 1938, citing reference to scores of publications in which the lung and skin hazards of asbestos are discussed. This file would cover five or six hundred pages ***.

If the reaction is unfavorable, use the asbestosis weapon in reserve to let them stew."

Another memorandum, dated February 6, 1956, and directed to the director of personnel and industrial relations of OCF, pertained to medical studies performed to determine the safety of fiberglass and stated:

"I suppose you already know that asbestos is fairly well incriminated as a carcinogen and the asbestos causes lung damage by virtue of the length of its fibers ***."

A letter dated February 8, 1956, which enclosed the above letter of February 6, stated:

"This is certainly not what I had in mind when I asked Dr. Schepers to give us a letter incorporating favorable statements based upon past experiments with Fiberglass in the laboratory. I personally do not like the general tenor of this letter. It is certainly nothing that we could show our customers or a union."

A memorandum dated September 17, 1963, having as its subject, "HEALTH HAZARD, KAYLO V. GPL-400," stated expressly:

"Asbestos (as found in Kaylo) when breathed into the lungs causes asbestosis which often leads to lung cancer."

In the above paragraph, the author went on to say that he had read three medical articles on the subject, and he noted North Carolina's requirement that all persons working with asbestos receive X-ray examinations. The memo continued:

"Based on presently available data, GPL-400 is not as detrimental to the health as Kaylo."

In 1965, a memo suggested that a warning be put on Kaylo:

"I have been receiving inquiries from various sources about the health hazards of our Kaylo products and I assume this will continue. ***

The reason for this memo is that I believe you should be informed about the status of the situation and that we should continue to give serious consideration to the labeling of our Kaylo in a manner similar to that currently being used by Johns-Manville. ***

I do not know how many states will allow suit to be brought against negligent manufacturers ***."

Another memo regarding the possibility of a warning label on Kaylo was written on September 21, 1970:

"Reference is made to your memo of September 15 regarding the warning label that should appear on Kaylo.

Are you saying that we have to do this now? I naturally would like to delay this requirement as long as possible."

Viewing this evidence in the light most favorable to the plaintiffs (*Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 426, 563 N.E.2d 397, 407, citing *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504), we believe this evidence was sufficient to warrant punitive damages. The evidence showed that defendant was aware of the hazards of asbestos, chose not to disclose the information, and failed to place warning labels on the product at the time it knew of the hazards of the product. In fact, defendant apparently chose to stockpile the information in the event that it could be beneficial in marketing other products. It is also evident that defendant continued to hesitate to place warning labels on the products as late as 1970, even after it became aware of the possibility of lawsuits. This conduct clearly amounts to an utter indifference to or conscious disregard for the safety of others.

Defendant, relying on *Kemner v. Monsanto Co.* (1991), 217 Ill. App. 3d 188, 576 N.E.2d 1146, also argues that plaintiffs failed to make a submissible case for punitive damages because there was no evidence of any corporate complicity by defendant. Under the corporate complicity rule, punitive damages can be assessed against a corporation only "if the superior officer of the corporation ordered, participated in, or ratified the 'outrageous conduct' of the employee. (*Kemner*, 217 Ill. App. 3d at 205, 576 N.E.2d at 1157, citing *Pendowski v. Patent Scaffolding Co.* (1980), 89 Ill. App. 3d 484, 411 N.E.2d 910.) A plaintiff is required to establish that there was "deliberate corporate participation by and through its officers or directors." (*Kemner*, 217 Ill. App. 3d at 207, 576 N.E.2d at 1158.) Defendant argues that plaintiffs failed to show corporate complicity because there was no evidence that defendant's corporate management knew of the risk or dangers of asbestos or acted willfully or wantonly. Defendant acknowledges the above memoranda, but asserts there was no showing of the responsibilities or authority of the authors of the memos.

In both *Kemner* and *Pendowski*, the issue was whether it was error for the trial court to refuse to instruct the jury on corporate complicity. In each of those cases, the trial court failed to give an instruction on complicity but instead gave the same instruction that was given in the case at hand: "The defendant is a corporation and can act only through its officers and employees. Any act or omission of an officer or employee within the scope of employment is the action or omission of the defendant corporation." (Illinois Pattern Jury Instructions, Civil, No. 50.11 (2d ed. 1971).) Under this instruction, a corpo-

ration is liable for any act of an employee, rather than those only ordered, participated in, or ratified by a superior officer. Thus, under this instruction, no corporate complicity is required.

In the case at hand, however, defendant has waived any argument regarding the lack of corporate complicity. Defendant failed to object to this instruction and did not tender a proposed instruction of his own. Therefore, the issue is waived. *Deal v. Byford* (1989), 127 Ill. 2d 192, 537 N.E.2d 267.

Furthermore, even had a corporate complicity instruction been given, there was sufficient evidence to infer corporate complicity. Defendant does not dispute the authenticity of the documents. Most of the documents are on defendant's company letterhead and are entitled "intra-office correspondence." At least two of the memos make reference to the company president, and one was written to the director of personnel and industrial relations. Furthermore, there were several letters, each pertaining to marketing, company policies, and business, which indicate that the memos were written by persons with authority within the corporation. We do not believe it is necessary that there be direct proof, such as in the form of a superior officer's signature, to show corporate complicity. It can be reasonably inferred from the evidence presented that there was deliberate corporate participation. *Kemner v. Monsanto Co.* (1991), 217 Ill. App. 3d 188, 576 N.E.2d 1146.

### B. EXCESSIVENESS

■ ■ Defendant argues next that the five punitive damage awards, totaling $5 million, are excessive. Defendant asserts that there are three factors, not properly considered here, which should be considered in determining whether a punitive damages award is excessive: (1) the enormity of the wrong; (2) the financial status of the defendant; and (3) the potential liability of the defendant. (*Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 450 N.E.2d 1199; *Deal v. Byford* (1989), 127 Ill. 2d 192, 537 N.E.2d 267.) Defendant argues that based on these factors, the awards are excessive.

In Illinois, the nature of punitive damages is punishment for the defendant, and "[t]hat punishment is designed in turn to promote three purposes: (1) to act as retribution against the defendant; (2) to deter the defendant from committing similar wrongs in the future; and (3) to deter others from similar conduct." (*Hazelwood*, 114 Ill. App. 3d at 712, 450 N.E.2d at 1207.) An award of punitive damages will not be disturbed on appeal as being excessive unless it is the

result of passion, partiality, or corruption. *Deal v. Byford* (1989), 127 Ill. 2d 192, 537 N.E.2d 267.

Defendant first argues that its conduct was not so egregious as to justify the award. We disagree.

As we previously indicated, the evidence showed that defendant was aware of the dangers of asbestos and, in fact, planned to use that information in marketing another product. The intraoffice memos also indicated a deliberate failure to warn. Asbestosis is a horrible disease that generally results in a painful and prolonged death. Surely defendant cannot be serious when it maintains that willfully exposing and causing this horrible disease for five persons is not an enormous wrong.

We also disagree with defendant's assertion that plaintiffs' failure to introduce evidence of defendant's financial status requires an automatic remittitur of the awards. (*Black v. Iovino* (1991), 219 Ill. App 3d 378, 580 N.E.2d 139, *appeal denied* (1992), 143 Ill. 2d 636, 587 N.E.2d 1011.) We decline to follow *Black* and rely on the ruling of our supreme court in *Deal v. Byford* (1989), 127 Ill. 2d 192, 537 N.E.2d 267, that plaintiffs were not required to introduce evidence of defendant's financial status in order to recover punitive damages. Defendant did not offer evidence of its financial status, and it cannot now complain of its absence. *Deal v. Byford* (1989), 127 Ill. 2d 192, 537 N.E.2d 267; see also *Ekl v. Knecht* (1991), 223 Ill. App. 3d 234, 585 N.E.2d 156; *Verdonck v. Scopes* (1992), 226 Ill. App. 3d 484, 590 N.E.2d 545.

We next consider defendant's potential liability. In support of its post-trial motion, defendant filed the affidavit of Robert McComber an attorney for defendant responsible for maintaining records regarding the status of asbestos litigation pending against it. According to his affidavit, as of November 30, 1990, there were almost 85,000 cases pending against defendant with new cases being filed at a rate of almost 2,000 a month. The affidavit also listed several previous judgments against defendant of huge amounts, but the affidavit fails to tell if defendant paid such judgments.

There is no doubt that defendant's potential liability is great. It does not take a mathematical genius to figure out that if defendant has 85,000 suits filed against it and it loses 10% of the suits with punitive damages awarded in the sum of $1 million, defendant's potential liability would be $8.5 billion for punitive damages alone. This evidence and reasoning, however, were not presented to the jury.

The basic problem with defendant's argument is that the jury was not given any of the information that defendant now wants us to consider, because the defendant elected not to submit the information to

the jury. We have held before that "[t]he jury, with its unique. ability to articulate community values, should decide whether punitive damages should be imposed." (*Knecht v. Radiac Abrasives, Inc.* (1991), 219 Ill. App. 3d 979, 984, 579 N.E.2d 1248, 1251, *appeal denied* (1992), 143 Ill. 2d 639, 587 N.E.2d 1016.) Defendant is now asking us to reverse a jury verdict simply because $5 million is a lot of money. This court, however, does not possess a better ability to articulate community values than the 12 jurors in this case.

Further, plaintiffs cannot cross-examine an affidavit, nor were plaintiffs given the opportunity to contest the allegations in the affidavit. We do not know, therefore, if there are 85,000 suits similar to this case pending against defendant, whether defendant has any insurance to cover the judgments, what percentage of the suits will most likely result in judgments against the defendant (we note that the jury found against four plaintiffs in this case), whether structured settlements can be reached in many cases, whether defendant is a $1 million company or a $10 billion company, and whether juries will award such punitive damages if they are made aware that there may not be any money left for actual damages for the thousands of plaintiffs whose cases have not been tried. While potential liability is a factor to be considered, since defendants failed to timely submit the evidence of potential liability we cannot now consider the evidence on review.

### C. CONSTITUTIONAL

Defendant's next argument regarding punitive damages is that the awards violated defendant's procedural and substantive due process rights under the due process clause of the fourteenth amendment and article I, section 2, of the Illinois Constitution. Defendant cites *Pacific Mutual Life Insurance Co. v. Haslip* (1991), 499 U.S. 1, 113 L. Ed. 2d 1, 111 S. Ct. 1032, for the proposition that there are procedural and substantive due process guidelines to insure that punitive damage awards are fair, which are not present here.

In *Haslip*, in deciding that the punitive damages in an Alabama case did not violate the due process clause of the fourteenth amendment, the Supreme Court noted that there was no "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable" (*Haslip*, 499 U.S. at 18, 113 L. Ed. 2d at 20, 111 S. Ct. at 1043), but that "general concerns of reasonableness and adequate guidance from the court *** enter into the constitutional calculus." (*Haslip*, 499 U.S. at 18, 113 L. Ed. 2d at 20, 111 S. Ct. at 1043.) The court then considered the instructions given to the jury

and Alabama's post-trial and appellate review. In light of *Haslip*, we will consider the same.

## 1. INSTRUCTIONS

Defendant alleges that the jury instructions violated defendant's procedural due process rights because the jury was permitted to exercise "unbridled discretion" in awarding the punitive damages. We disagree.

■ We first note that defendant has waived any objection to the jury instructions because it did not tender its own version of instructions. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 537 N.E.2d 267.) Nevertheless, we will address the constitutionality of the jury instructions. These instructions defined "willful and wanton" and instructed on punitive damages, stating:

> "*If you find* that defendant's conduct was *wilful* and *wanton* and proximately caused injury to the plaintiff, and *if you believe* that *justice* and the *public good require it*, you may *** award an amount which will serve to *punish the defendant and to deter others* from the commission of like offenses." (Emphasis added.)

We do not believe these jury instructions gave the jury such "unbridled discretion" that they were unconstitutional. The instructions indicated to the jury that punitive damages were not mandatory, that willful and wanton conduct was required, and they were only to be awarded if the "public good require[d] it." It also identified the purpose and policy of punitive damages in Illinois: to "punish" and to "deter." (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.) These instructions conformed with those under Illinois law. (Illinois Pattern Jury Instructions, Civil, Nos. 14.01, 35.01 (3d ed. 1992).) We find that the discretion exercised here was within reasonable constraints and due process was satisfied. *Haslip*, 499 U.S. at 20, 113 L. Ed. 2d at 21, 111 S. Ct. at 1044.

## 2. POST-TRIAL AND APPELLATE REVIEW

Defendant claims that Illinois standards for post-trial and appellate review do not provide a sufficiently meaningful constraint on the jury. Defendant specifically refers to the trial court's lack of discussion on punitive damages in denying its post-trial motion as demonstrating the lack of meaningful standards.

■ We find, however, that post-trial and appellate review in Illinois does provide a sufficiently meaningful constraint on the jury. In denying defendant's post-trial motion, the trial judge noted that

defendant's claims regarding punitive damages were without merit or were waived. The instructional error was waived because defendant failed to tender what it considered to be proper instructions, and defendant's argument that it had already been punished sufficiently was waived because the evidence was not presented at trial. We do not agree that without a more thorough discussion there cannot be an effective appellate review.

Furthermore, the procedures for post-trial and appellate review are sufficient. Section 2—1207 of the Code of Civil Procedure provides that a trial court has discretion to determine whether a punitive damages award is excessive and, if so, may enter a remittitur and a conditional new trial. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1207.) Also, in *Hazelwood*, the court outlined three factors that should be considered when determining whether a punitive damages award is excessive. Those factors include the enormity of the wrong, the defendant's financial status, and the potential liability of the defendant. (*Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 450 N.E.2d 1199.) These factors are not exhaustive. Each case must be assessed in light of its particular facts, and the underlying purposes of an award must be satisfied. (*Deal*, 127 Ill. 2d at 204.) We believe these procedures for review of the awards are constitutionally sufficient.

We also note the prejudgment protections against punitive damage awards both prior to trial and before the punitive damages issue is presented to the jury. Section 2—604 of the Code of Civil Procedure requires that before a plaintiff can file a pleading seeking punitive damages, the plaintiff must establish at an evidentiary hearing "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." (Ill. Rev. Stat. 1989, ch. 110, par. 2—604.1.) This determination was made before the trial began in the case at hand. Also, the trial court decides whether the evidence makes a *prima facie* case for punitive damages. (*Knecht v. Radiac Abrasives, Inc.* (1991), 219 Ill. App. 3d 979, 579 N.E.2d 1248.) This determination was made here on defendant's motion to prevent the issue from being submitted to the jury and when the court considered the jury instructions. The trial court then submitted the issue to the jury, whose decision was whether to award punitive damages and, if so, in what amount.

### 3. SUBSTANTIVE DUE PROCESS: EXCESSIVENESS

■ Defendant argues that these awards must be reviewed under substantive due process standards for excessiveness. We find that

these awards do not violate due process in this case. As stated in *Haslip*, there is no bright line between what is constitutionally acceptable or unacceptable. (*Haslip*, 499 U.S. at 18, 113 L. Ed. 2d at 20, 111 S. Ct. at 1043.) We also reject defendant's claim, based on *Haslip*, that we should consider the relativeness of the awards to a comparable civil fine in Illinois and that since Illinois does not have a civil fine, the awards must be excessive. *Haslip* did not require that this be considered, and we do not believe that the absence of an Illinois law allowing a civil fine to be imposed means that the awards are excessive and lack an objective basis. The Supreme Court in *Haslip* indicated that the punitive damages awarded in that case were "much in excess of the fine that could be imposed for insurance fraud" in Alabama and took note that a person could be imprisoned for fraud. (*Haslip*, 499 U.S. at 23, 113 L. Ed. 2d at 23, 111 S. Ct. at 1046.) We do not see the need to discuss whether defendant or its employees violated the criminal laws of Illinois. It should be readily apparent that whenever an individual or a company is made aware that contact with its product can cause a horrible disease and death, society expects that individual or company to take whatever steps that are reasonable and necessary to warn the public of the dangers and to prevent such contact with the product that could be fatal. As noted before, a $5 million verdict for punishment and deterrence for willfully and wantonly causing five persons to suffer asbestosis "does not cross the line into the area of constitutional impropriety." *Haslip*, 499 U.S. at 24, 113 L. Ed. 2d at 23, 111 S. Ct. at 1046.

#### 4. MULTIPLE PUNITIVE DAMAGE AWARDS

Defendant argues the violation of its procedural and substantive due process rights through multiple punitive damage awards for similar conduct should compel us to vacate the awards.

■ Defendant urges that due process requires this court to establish meaningful procedures to protect it from multiple punishments and that these procedures "should apply to prevent the issue of punitive damages from ever being submitted to the jury in this case based on the facts established in the McComber affidavit." We do not need to decide if meaningful procedures should be established in this case, because defendant failed to present any evidence to the court of the matters contained in the McComber affidavit until after the trial.

We note again that Illinois does provide sufficient guidelines, which also act to protect a defendant from multiple punishments, specifically the court's consideration of defendant's potential liability. (*Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703,

450 N.E.2d 1199.) In this case, defendant did not submit the McComber affidavit until it filed its post-trial motion. Defendant cannot now complain that in light of the allegations in the McComber affidavit the trial judge erred in submitting the issue of multiple punitive damage awards to the jury, because at that time the trial judge was unaware of the McComber affidavit. The trial judge has enough burdens without being further saddled with the burden of learning of and presenting defendant's case.

## IV. EXPERT TESTIMONY

Defendant's next argument raises the most perplexing issue in this case. Defendant contends that the trial court erred by allowing plaintiffs' expert, Dr. Wagoner, a biostatistician and epidemiologist, to read into evidence the underlying data and information on which he based his opinion that asbestos was linked to asbestosis by 1930 and to lung cancer between 1949 and 1955.

One of the issues in the case was defendant's knowledge regarding the hazards of asbestos. Plaintiffs offered Dr. Wagoner's testimony to show when the relationship between asbestos and asbestosis was established and to show that medical and industrial literature existed, prior to the time that defendant put warning labels on Kaylo, that end-users of asbestos products had contracted asbestos-related diseases. Plaintiffs hoped to prove by Dr. Wagoner's testimony that it was generally known within the asbestos industry and by defendant by 1955 that asbestos caused asbestosis and lung cancer. A jury could then conclude from all of the evidence that defendant had deliberately chosen to ignore and cover up the dangers of asbestos for more than 17 years without warning end-users or finding a substitute for asbestos.

■ Over defendant's objection, the trial judge allowed Dr. Wagoner to summarize, in detail, various medical and industrial articles published before 1955 pertaining to studies performed and their results regarding the effects of asbestos. Defendant argues that the doctor's testimony was inadmissible under *Schuchman v. Stackable* (1990), 198 Ill. App. 3d 209, 555 N.E.2d 1012, *appeal denied* (1990), 133 Ill. 2d 573, 561 N.E.2d 708, which defendant claims held that an expert may not read from medical literature. We decline to follow *Schuchman*, not because we believe it is wrong; rather, we believe it to be distinguishable.

In *Schuchman*, this court relied on *Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463 N.E.2d 216, which held that evidence of the content, or summaries of the content, of medical liter-

ature could not be introduced as substantive evidence. We believe that *Schuchman* is limited to those situations where the expert is not using the content of the medical literature as a basis for his or her opinion but rather the expert is attempting to bolster his opinion by showing that other experts agree with him. The expert witness then becomes a conduit for bringing before the jury a number of opinions of other experts without incurring the cost of hiring such experts and without subjecting these other experts to cross-examination. Under these circumstances it does not matter if the witness is an expert in the field for which he is called, but rather the only question is whether the witness can read!

Our case is distinguishable from *Schuchman*, because in *Schuchman* the literature was being offered in "support" of the expert's opinion and to show that "there are studies that exist that are consistent with his opinion," whereas in this case, the literature was offered as the underlying facts for Dr. Wagoner's opinion. In *Schuchman* and *Mielke*, the excluded testimony was not directly pertinent to the litigation or to the plaintiff's treatment. In this case, the articles and studies published before 1955 were directly pertinent to the question, What did defendant know and when did it know it? The literature in *Schuchman* and *Mielke* was not necessary for the experts in those cases to form an opinion or to explain their opinion, whereas in this case Dr. Wagoner had to refer to the literature in order to explain his opinion and why he came to his opinion.

We recognize that this is just another area of the law that is evolving toward more openness in the presentation of evidence. While we are not prepared to go as far as Justice Chapman of this court, who wrote a vigorous dissent in *Schuchman* in which he stated that he believed *Mielke* had been implicitly overruled by *People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485, *cert. denied* (1986), 479 U.S. 1012, 93 L. Ed. 2d 713, 107 S. Ct. 658 (*Schuchman v. Stackable* (1990), 198 Ill. App. 3d 209, 231, 555 N.E.2d 1012, 1026 (Chapman, J., dissenting)), we recognize that *Anderson* certainly uses such broad language that one might draw the conclusion, as did Justice Chapman, that an expert witness can give a complete history and summary of all of the scientific literature on a particular subject as long as he states that such literature is the basis of his opinion.

In *Anderson*, our supreme court held, after interpreting and analyzing Federal Rules of Evidence 703 and 705, *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171, and *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140, that "an expert should be allowed to reveal the

content of materials upon which he reasonably relies in order to explain the basis of his opinion." (*Anderson*, 113 Ill. 2d at 9, 495 N.E.2d at 488.) The only limitations are that the expert reasonably relied on the material and its probative value must outweigh any prejudicial impact. (*Ziekert v. Cox* (1989), 182 Ill. App. 3d 926, 538 N.E.2d 751.) A trial court's determination of whether the underlying facts or data upon which the expert bases his opinion are of a type reasonably relied on by experts in the particular field will not be disturbed absent an abuse of discretion. *City of Chicago v. Anthony* (1990), 136 Ill. 2d 169, 554 N.E.2d 1381, *cert. denied* (1990), 498 U.S. 900, 112 L. Ed. 2d 214, 111 S. Ct. 256.

The court in *Anderson* did worry about the information forming the basis of the expert's opinion being misused by the jury as substantive evidence and suggested a limiting instruction advising the jury to consider such underlying information only to evaluate the basis of the expert's opinion. (*Anderson*, 113 Ill. 2d at 12, 495 N.E.2d at 490.) The court also hedged its ruling by advising that "[a] trial judge, of course, need not allow the expert to recite secondhand information when its probative value in explaining the expert's opinion pales beside its likely prejudicial impact or its tendency to create confusion." *Anderson*, 113 Ill. 2d at 12, 495 N.E.2d at 490.

We believe that the trial court in this case properly permitted Dr. Wagoner to summarize the articles as a basis of his opinion and to show notice to defendant. Dr. Wagoner was not citing the articles to show that other experts agreed with him or even to show that the articles proved the truth of the matter asserted, that asbestos causes asbestosis. His testimony and summary of the articles were intended to show when, in his opinion, it was generally known or should have been known in the industry that asbestos caused asbestosis and was linked to cancer. If Dr. Wagoner had been prevented from summarizing and quoting from the various articles, then we would have had the bare opinion that defendant should have known of the connection between asbestos and asbestosis and cancer because there were articles written before 1955 that said so. Our supreme court recognized this problem in *Anderson* and stated: "Absent a full explanation of the expert's reasons, including underlying facts and opinions, the jury has no way of evaluating the expert testimony [citation] and is therefore faced with a 'meaningless conclusion.' " (*Anderson*, 113 Ill. 2d at 11, 495 N.E.2d at 489.) Allowing Dr. Wagoner to summarize the medical literature permitted the jury to better assess the weight and credibility of his testimony.

There is another exception to the hearsay rule that is applicable to the issue before this court, and that exception is notice. The hearsay rule prohibits introducing into evidence an out-of-court statement, written or oral, that is offered for the truth of the matter asserted therein. (*People v. Campbell* (1975), 28 Ill. App. 3d 480, 328 N.E.2d 608.) An out-of-court statement offered for some independent purpose, rather than the truth of the matter asserted, is not hearsay. (*Thornton v. University Civil Service Merit Board* (1987), 154 Ill. App. 3d 1016, 507 N.E.2d 1262.) A writing that is offered to prove that the recipient had notice of the information contained therein rather than to prove the truth of the matter asserted is admissible. (*People v. Campbell* (1975), 28 Ill. App. 3d 480, 486, 328 N.E.2d 608, 615; *Charleston National Bank v. International Harvester Co.* (1974), 22 Ill. App. 3d 999, 317 N.E.2d 585; *Hanlon v. Airco Industrial Gases* (1991), 219 Ill. App. 3d 777, 579 N.E.2d 1136, *appeal denied* (1992), 143 Ill. 2d 638, 587 N.E.2d 1014.) Further, a newspaper article may fall within the exception to the hearsay rule for showing notice. *Deerhake v. Du Quoin State Fair Association, Inc.* (1989), 185 Ill. App. 3d 374, 381, 541 N.E.2d 719, 722, *appeal denied* (1989), 127 Ill. 2d 613, 545 N.E.2d 107.

Defendant admitted in interrogatories that it received certain medical and industrial journals. Dr. Wagoner also testified on the content of various articles contained in those journals that should have put defendant on notice that people using asbestos products could develop asbestos-related diseases. Since two of the underlying issues in this case were, What did defendant know? and When did defendant know it?, evidence of the content of the articles that defendant received was the only method plaintiffs had, other than trying to search for key employees that worked for defendant 35 years or more ago as witnesses, in order to prove what and when defendant knew of the dangers of asbestos.

The judge issued two cautionary instructions to the jury that that evidence was not to be considered for its truth but, rather, it was only relevant to the issue of notice: what defendant knew or should have known. Furthermore, defendant had the opportunity to rebut this by presenting evidence on the "state of the art" issue through its own witnesses.

Finally, we determine that the probative value of the evidence of the studies outweighed its prejudicial effect because it is no longer disputed that, in fact, asbestos is linked to various lung disorders. Thus, the opinions contained in the articles and literature were not in dispute, and therefore such opinions could not be prejudicial.

## V. DEPOSITION TESTIMONY

Herman Davis testified at trial that he had seen Kaylo throughout the Amoco facility. Defendant then, on cross-examination, sought to impeach Davis by reading a portion of his deposition where Davis indicated he had only seen Kaylo at a storage building. On rebuttal, plaintiffs' counsel read another portion of Davis' deposition in which Davis was asked which products he was able to identify. Plaintiffs' counsel read only a portion of Davis' answer; "the Kaylo pipe covering and block." Plaintiffs' counsel did not read the other portion of the answer wherein Davis identified five other products he had seen at the plant. Defendant objected, arguing that the entire answer should have been read to the jury because reading only that portion gave the jury the erroneous impression that Kaylo was the only product Davis could remember and identify. The trial court ruled that the evidence was properly excluded based on *Lipke*, which the court relied on in excluding evidence of exposure to other asbestos-containing products.

Defendant argues that it was error to allow only a portion of the deposition to be read and not the remainder because *Lipke* does not support the exclusion of evidence of exposure to other asbestos products and it was a violation of Supreme Court Rule 212(c) (134 Ill. 2d R. 212(c)).

■■ We first note that, as we stated in our ruling in defendant's first argument, evidence of exposure to other manufacturers' products is irrelevant. We must next consider, however, whether, in light of our ruling, Rule 212(c) requires that the entire answer should have been read. We conclude that it does not.

Supreme Court Rule 212(c) states in part:

> "If only a part of a deposition is read or used at the trial by a party, any other party may at that time read or use or require him to read any other part of the deposition which ought *in fairness* to be considered." (Emphasis added.) 134 Ill. 2d R. 212(c).

"Fairness" is the standard when considering whether the additional part of a deposition sought to be used should also be read into evidence. (Ill. Ann. Stat., ch. 110A, par. 212(c), Historical & Practice Notes, at 304 (Smith-Hurd 1985); see *Dombrowski v. Laschinski* (1978), 67 Ill. App. 3d 506, 385 N.E.2d 35.) As stated in *Morse v. Hardinger* (1976), 34 Ill. App. 3d 1020, 1025, 341 N.E.2d 172, 176, "[t]hough the fairness referred to in Rule 212(c) must always be insured, it must not be used as an excuse to sweep irrelevant material

into evidence." Evidence of exposure to other manufacturers products is irrelevant. Therefore, we conclude that the evidence was properly excluded.

## VI. PRIOR SETTLEMENT

An intraoffice document, dated August 21, 1969, referred to new lawsuits against defendant and to an unrelated asbestos case in which defendant settled. The document stated in part: "The Claude Tomplait case settled out of court with payment earlier this year." Defendant's objection on the grounds that it could not be admitted because it referred to a settlement was overruled, and the document was admitted.

Defendant argues that the trial court erred by admitting the document into evidence because it contained a reference to a settlement by defendant in a prior asbestos suit. We disagree.

██ Evidence of settlement is generally inadmissible, and this rule has applied to a settlement with a third party arising out of the same automobile accident (*Hill v. Hiles* (1941), 309 Ill. App. 321, 32 N.E.2d 933) and to a settlement that did not arise out of the same occurrence (*Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.* (1990), 196 Ill. App. 3d 5, 552 N.E.2d 1151, *appeal denied* (1990), 133 Ill. 2d 556, 561 N.E.2d 692). In the case at hand, however, the admission of the evidence does not require reversal.

This evidence of an unrelated settlement came in one of several memos and referred to an incident that occurred in 1969. The evidence was not introduced to show liability but was contained in a memo used to show notice and defendant's knowledge that asbestos was dangerous and yet continued to produce the Kaylo in spite of the hazards to the health of end-users. We cannot say that admitting this evidence of settlement was so prejudicial that it had a material effect on the outcome (*J.L. Simmons Co. ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.* (1985), 108 Ill. 2d 106, 483 N.E.2d 273), and we therefore refuse to reverse on this basis.

## VII. FEAR OF CANCER

Defendant argues that plaintiffs Reneau, Granger, and Davis failed to offer sufficient evidence to allow recovery for fear of cancer.

We note at the outset that plaintiffs did not make a separate claim for fear of cancer, nor was this a claim for increased risk of cancer. Fear of cancer was only part of emotional distress, an element of pain and suffering.

At trial, plaintiffs Reneau, Granger, and Davis sought to recover for fear of cancer as an element of emotional distress. The trial judge distinguished this case, where there was an alleged underlying injury, from a case where there was no injury and just a claim for fear of cancer. The trial judge was unable to find an Illinois case pertaining to what was required in order to recover for fear of cancer, and so he ruled based on *Dartez v. Fibreboard Corp.* (5th Cir. 1985), 765 F.2d 456, that two foundation requirements must be satisfied. Plaintiffs were required to show: first, that plaintiffs had some knowledge, through some type of communication, that their condition may become worse, *i.e.*, it may turn into cancer; and second, that there must be competent medical evidence indicating to a reasonable degree of medical certainty that they either are at an increased risk of cancer or that they might or could develop cancer. If the plaintiffs met both of these tests, then evidence of damages for fear of cancer would be admissible; these damages would not be to compensate them for future cancers that may result, but would be for the emotional distress or fear that cancer may result. The judge said he would entertain a motion to strike if the proper foundation were not laid.

Plaintiffs' medical experts, Dr. Yanta and Dr. Wagoner, testified that each plaintiff was at an increased risk of cancer. Defendant claims, however, that Granger, Davis, and Reneau each failed to offer sufficient evidence on the first requirement.

When ruling on the jury instructions regarding pain and suffering, the trial judge ruled that the part of the instruction stating, "the reasonable fear and anxiety experienced so on and so forth with respect to risk of cancer[,] that is stricken. That is all contained in the element of damages pain and suffering." Thus, the jury was not specifically instructed on fear of cancer as a separate element of damages, nor did the instructions mention fear of cancer itself. The verdict forms returned by the jury did not refer to fear of cancer, but only to past and future pain and suffering. There is no evidence that the jury's award reflected any fear-of-cancer claim.

In plaintiffs' counsel's closing argument on the issue of damages, he referred to past and future pain and suffering, "including fear of cancer," and informed the jury what he thought it was worth.

■■■ We find that any error regarding this issue has been waived. The trial judge said he would entertain a motion to strike if the foundation was not met, and defendant did not make such a motion. Defendant also did not object to plaintiffs' counsel's closing argument or attempt to have the judge inform the jury that they should not consider fear of cancer as part of pain and suffering.

## VIII. REDUCTION OF DAMAGES

Defendant's last argument is that, in the alternative, the amount of the award should be reduced to reflect the amount of the settlements paid by the settling defendants.

Prior to trial there were several defendants. Just after the trial began, all of the defendants, except for OCF, allegedly settled with plaintiffs. Defendant, citing section 2 of the Contribution Act (Ill. Rev. Stat. 1989, ch. 70, par. 302(c)), argues that as a matter of law we should reduce the jury award by these amounts. Section 2(c) states:

> "When a release or covenant not to sue or not to enforce judgment is given in good faith to one or more persons liable in tort arising out of the same injury or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide but it reduces the recovery on any claim against the others to the extent of any amount stated in the release or the covenant, or in the amount of the consideration actually paid for it, whichever is greater." Ill. Rev. Stat. 1989, ch. 70, par. 302(c).

■■■ Defendant did not raise the right to reduce the judgment by any settlements in its post-trial motion. Plaintiffs claim that any reduction in the judgment is waived because of defendant's failure to raise such in its post-trial motion. However, the trial judge has not been given the opportunity to decide the issue of whether defendant is entitled to a setoff against compensatory damages and, if so, in what amount.

In light of the foregoing, the judgment awarding punitive damages is affirmed. The judgment awarding compensatory damages is conditionally affirmed; we remand to the circuit court for a determination of whether defendant has the right to a setoff against compensatory damages, and if so, in what amount.

Affirmed in part; conditionally affirmed in part and remanded with directions.

WELCH and GOLDENHERSH,* JJ., concur.

---

*Justice Harrison participated in oral argument. Justice Goldenhersh was later assigned to this case in substitution for Justice Harrison, and Justice Goldenhersh has read the briefs and listened to the audiotape of oral argument.