SIXTH DIVISION

                                               September 5, 1997                                           

No. 
1-95-4079

N.W.I. INTERNATIONAL, INC.,             )  Appeal from the

                                        )  Circuit Court of

Plaintiff-Appellee/Cross-Appellant,)  Cook County.

                                        )

v.                            )

                                        )

EDGEWOOD BANK,                          )  

                                        )  

Defendant-Appellant/Cross-Appellee,)

                                        )

and                           )

                                        )

CHARLES A. BRUNING,                     )  Honorable

                                        )  Cyril J. Watson,

Defendant/Cross-Appellee.          )  Judge Presiding.

Modified Upon Denial Of Petition For Rehearing

PRESIDING JUSTICE GREIMAN delivered the opinion of the court:

Plaintiff, NWI International, Inc. (NWI), borrowed operating capital from Edgewood Bank (Edgewood or the bank) over several years with loans secured by notes and a security agreement. Eventually, the bank required that all obligations be consolidated into a single note that incorporated the security agreement by reference. Soon after, the bank deemed itself insecure and called the note, collecting part from funds on deposit and the balance by exercise of assignments of accounts receivable.

NWI brought this action against Edgewood, alleging breach of the parties' lending agreement with respect to the loan. Following a jury trial, the trial court entered judgment on the jury's verdict in favor of NWI in the amount of $4,700,001. The bank appeals the verdict and judgment entered against it.

The central issues before us are whether: (1) the note executed by NWI was a demand note, or otherwise, and who should make that determination; (2) the jury was properly instructed with regard to the character of the instrument; (3) the bank's declaration of default was proper; (4) the instructions to the jury as to damages available for breach of a lending agreement were appropriate, whether the damages assessed by the jury for lost profits were proper and whether the jury's verdict was against the manifest weight of the evidence.

Additionally, issues have been raised relating to whether NWI materially breached the agreement between the parties, thus precluding recovery, mitigated its alleged damages and whether the trial court erred in excluding evidence of NWI's failure to perform under the terms of a contract that was the basis for a claim upon NWI's performance bond.

NWI cross-appeals from directed verdicts in favor of the bank on NWI's conversion and tortious interference counts, alleging trial court error in directing those verdicts.

The Illinois Bankers Association was given leave by this court to file an 
amicus
 
curiae
 brief which supports Edgewood's stance on appeal and argues that the note was a demand instrument and that the jury should have been instructed to apply a subjective standard as to whether the bank had reason to deem itself insecure.

We do not lightly overturn jury verdicts, particularly where plaintiff's counsel have conducted such a thorough presentation, however, for the reasons that follow, we affirm in part, reverse in part and remand.

NWI was incorporated in 1975 by its principal, John Robertson (Robertson). Prior to its dissolution in 1992, NWI was a welding company specializing primarily in metal fabrication and repair and whose customers included Commonwealth Edison (Com Ed), nuclear utilities and the United States military.

NWI's initial contact with Edgewood came in 1979 or 1980, when Edgewood's president, Charles Bruning (Bruning), introduced himself to Robertson. A relationship soon began, and in the spring of 1980, Edgewood extended a $375,000 line of credit to NWI for working capital. The line was increased to $500,000 a year later, and to $800,000 in May of 1982. Bruning served as the loan officer and NWI's primary contact with Edgewood from 1980 until 1983.

In drawing on the line of credit, NWI executed 90-day notes, and when the note matured it either paid the interest and renewed the note or paid it off entirely. Most often, NWI would pay the interest and roll over the principal to a new 90-day note. The interest rate on NWI's loans was prime plus 1%, which ranged between 11% and 22% over the course of the parties' relationship. NWI was required to execute a typewritten security agreement dated September 23, 1980, that set forth Edgewood's right to accelerate the loan in the event of default, including failure to make required payments or impairment of collateral and at least 10 other events of default. The agreement also provided "that the Bank shall not be liable for any error of judgment or mistakes of fact or law."

In 1981, NWI was awarded a subcontract worth approximately $1 million on a Department of Energy project contracted to Dynamic Industrial Contractors (DICON). The project involved on-site fabrication of aluminum pipe, which, according to NWI, was a unique application for the DICON job. NWI purchased $250,000 of equipment to use at the DICON site and began work in May 1982.

In early 1983, NWI was on schedule with the DICON project, but DICON had stopped paying its subcontractors, leaving NWI with a receivable of $579,000. In response, NWI discontinued work for DICON. DICON, however, prevented NWI from removing its equipment from the worksite and filed a claim against NWI's performance bond on the project. The DICON project ultimately resulted in litigation between DICON and NWI.

In March 1983, Robertson and his attorney met with Bruning to discuss the effect of the DICON situation and whether Edgewood would continue to finance NWI. According to Bruning, he had concerns about NWI's survival due to its diminishing cash flow after the failure of the DICON project. Bruning was aware that the total loss to NWI as a result of the DICON project, including the receivable and lost equipment, was roughly $800,000.

As a result, Edgewood required NWI to submit more frequent financial statements, updated accounts receivable and additional collateral in the form of Robertson's personal residence. For the first and second fiscal quarters of 1983, NWI failed to pay the Internal Revenue Service (IRS) payroll withholdings and social security (FICA) taxes in the amount of $200,000. In April 1983, state bank examiners classified the NWI loan as "substandard," causing Edgewood to place the loan on its "watch list." During and following this period, NWI went through three accountants who produced conflicting financial statements, all of which documented losses by the company. In short, Edgewood maintains that it then viewed the loan as "insecure."

 In July 1983, Foothill Capital Corporation (Foothill), a venture capital firm, was contacted as a possible successor lender for alternate or additional financing to NWI for working capital. NWI was, however, reluctant because the terms of any financing through Foothill imposed substantially higher interest.

Edgewood advised NWI that it was at its legal lending limit and contacted LaSalle National Bank (LaSalle) as a potential third-party lender. LaSalle agreed to lend NWI $100,000, which was necessary to allow NWI to bid on a Com Ed job valued at $500,000, which NWI subsequently received.

An agreement was discussed between NWI, Edgewood and LaSalle to finance NWI for the next five years, assuming the company remained "viable." As part of this agreement, Edgewood asked Robertson to execute a consolidated note for $800,000, dated October 31, 1983. This note consolidated all outstanding notes NWI had with Edgewood and represents the agreement here at issue. The note was a printed form with the words "on demand" typed in after the amount of the loan is described and after the explanation as to when the loan is payable. However, in addition, there is a typed statement that the security agreement of September 23, 1980, would be incorporated by reference. Hence, both the notation that the instrument is payable on demand and the incorporation by reference in the agreement that sets out the events of default have been typed onto the form note. Robertson testified that he "knew" the note was a demand instrument and that none of the prior notes contained demand language.

Watching its investment, LaSalle embarked on a collateral review of NWI through the accounting firm of Friedman Raemer & Schwartz. Through its representative, Gene Leeb (Leeb), the firm's investigation of NWI revealed "inconsistencies" in NWI's bookkeeping, prompting Leeb to contact Edgewood. Unable to reach Bruning, who was out of town, Leeb spoke with Andrew Collins (Collins), who was new on the NWI account but functioned as Edgewood's chief loan officer, and expressed his concerns about NWI's financial status.

While Leeb's audit was ongoing, NWI deposited the $500,000 from the Com Ed project in its account with Edgewood. Leeb advised Collins that, given his analysis of NWI's future as uncertain, he should "lock-up" the $500,000 deposit as collateral on the outstanding $800,000 loan.

The next day, Leeb met with Collins to discuss his findings. This meeting prompted Collins to review the NWI file, which  caused Collins additional "concern" about the loan's status and NWI's future viability. As a result, Collins, in perhaps the move which most angered NWI and served as the primary basis for NWI's original complaint in this matter, placed the recent $500,000 deposit in a segregated account to which NWI had no access. 

NWI identifies the bank's act of segregating its funds as a breach of the loan agreement. NWI claims the breach was both unwarranted given NWI's relationship with Edgewood and the most recent award of a $1.5 million Com Ed project. As a direct result of the breach, NWI claims it was unable to procure alternate bank financing or bonding, both prerequisites in the area of contracting. After Edgewood called the loan, it sent letters to NWI customers advising them of its claim on NWI's accounts receivable. By late January 1984, NWI's debt to Edgewood was repaid through the offset of the $500,000 Com Ed payment and collection of $300,000 of NWI's accounts receivables. 

NWI maintains Edgewood's breach of the loan agreement was nothing short of "devastating" and lists as examples the facts that (1) NWI was relegated to "small jobs" from Com Ed; (2) NWI was taken off Sundstrand's active bid list; (3) Barber Coleman closed its account with NWI resulting in NWI's loss of its contract to manufacture air duct assemblies for the F-116 fighter plane; (4) Mobil Oil terminated its business relationship with NWI; and (5) Union Carbide removed NWI from its bid list.

After the bank called the loan, NWI "scraped by" doing small jobs and consulting work, financed by Robertson's personal assets and factoring -- financing on accounts receivable -- at a cost of $3,700 in interest on a $50,000 project for a 30-day period compared to bank financing at a cost of about $550. NWI remained in business "to some degree" until its eventual "demise" in 1992. NWI's expert, James Kerwin (Kerwin), opined that NWI's resulting lost profits ranged from $3.8 million to $5 million.

NWI first filed suit in December 1988, alleging breach of contract, conversion and bad-faith dealing against Edgewood and Bruning personally. NWI voluntarily dismissed the suit on December 20, 1989, and refiled it on December 19, 1990, alleging breach of contract, conversion, intentional interference with business relations, fraud and breach of the duty of good faith against Edgewood and Bruning. In both complaints, NWI characterized the consolidated note as a demand instrument -- "This note was payable on demand." 

In March 1995, just prior to trial, NWI filed an amended complaint, alleging breach of contract and conversion against Edgewood and interference with business relations against Edgewood and Bruning. The amended complaint omitted the allegation that the consolidated note was payable on demand.

The case was first tried in March and April of 1995. The trial court granted defendants' (Edgewood and Bruning) motion for directed verdicts on the claims of conversion and interference with business relations. However, the jury was unable to reach a verdict on the contract claim, and the trial court declared a mistrial.

Prior to retrial, Edgewood moved 
in
 
limine
 to bar evidence of NWI's lost profits on the basis that lost profits were not the proper measure of damages for breach of a lending agreement and that the period for which lost profits were sought was excessive. The trial court denied this motion. NWI moved 
in
 
limine
 to bar introduction of evidence relating to NWI's litigation and settlement with United States Fidelity & Guaranty (USF&G) arising out of the DICON project. The trial court denied this motion, although this issue was the subject of cross-examination of plaintiff's expert witness.

At the second trial before a different trial court, NWI's banking expert, Henry Faurest (Faurest), testified that the bank was not reasonably insecure as to NWI's loan, had acted contrary to the parties' established course of dealing, failed to give Robertson sufficient time to obtain alternate financing and directly interfered with NWI's ability to secure alternate financing. Faurest initially acknowledged that Edgewood had consolidated all of NWI's 90-day notes into a demand note. However, over objection, Faurest opined that a "true demand" note would not have any events of default or an insecurity clause.

David Keller (Keller), Edgewood's banking expert, testified that Edgewood acted reasonably and in line with industry practice in demanding payment from NWI. In Keller's opinion, Edgewood's concerns about the condition of the loan had been mounting throughout the early part of 1983, and that those concerns justified calling the loan. Keller pointed to the facts that  Edgewood (1) was aware of conflicting financial statements generated by NWI; (2) had noticed bank overdrafts; (3) was aware that bank examiners had classified the NWI loan as substandard; (4) was aware of NWI's loss, of a large receivable and equipment, on the DICON project; (5) was aware of NWI's failure to timely pay withholding taxes; and (6) knew of Leeb's report detailing his concerns about NWI's present and future viability.

Keller further testified that the consolidated note was a demand instrument which, regardless of whether Edgewood was reasonably insecure, could be called at any time.

Ray Throckmorton (Throckmorton), Edgewood's damages expert, opined that NWI suffered "no lost profits" as a result of the bank's actions.

Following the close of testimony, the trial court refused to give defendant's special interrogatory No. 1, which asked, "Was the note and security agreement dated October 31, 1983, a demand note?" The trial court stated: "The finding is I'm prepared today to say as a matter of law that *** it is not a demand note ***." The record is unclear whether this finding is based on the plain language of the note or only after admission of parol evidence. 

The trial court also rejected defendant's instruction No. 14, which defined a demand note and included the rules of construction set out in section 3-114 of the Uniform Commercial Code (UCC) (810 ILCS 5/3-114 (West 1992)). The trial court stated: "I have indicated to both parties that I do not find that this is a demand note. That's one of the reasons I refuse this [instruction]."

The trial court, however, also refused to give plaintiff's instruction No. 3, which stated that the note was not, as a matter of law, due on demand. Instead, the trial court instructed the jury that the bank would be liable if it accelerated the note when it was not reasonably insecure, acted contrary to the parties' established course of dealing and failed to act in good faith.

The trial court defined "good faith" as:

"The doctrine of good faith requires a party vested with contractual discretion to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. ***

When I use the words 'ordinary care,' I mean the care a reasonably careful person would use under the circumstances similar to those shown by the evidence. The law does not say how a reasonably careful person would act under those circumstances. That is for you to decide."

Finally, the trial court instructed the jury that the "elements of damages claimed by NWI International, Inc. in this case are the cost of alternative financing, the loss of profits."

The jury returned a verdict in favor of NWI, assessing damages in the amount of $4,700,001 against Edgewood. The trial court entered judgment on this verdict and denied Edgewood's post-trial motions. Also, the trial court declined to vacate the prior order directing verdicts in favor of Edgewood and Bruning on the counts of conversion and intentional interference with economic advantage. 

(1) The Nature of the Consolidated Note

From an examination of the plain language of the instrument, if the trial court can determine that it is or is not a demand note, then it may make an appropriate ruling as a matter of law without resort to extrinsic evidence. 
Bank of Ravenswood v. Polan
, 256 Ill. App. 3d 470, 474 (1993); 
Newcastle Properties, Inc. v. Shalowitz
, 221 Ill. App. 3d 716 (1991). That is a threshold decision for the trial court. On the other hand, if the language of the note is unclear and ambiguous as to whether the parties intended it to be a demand note, only then may evidence be offered regarding the intentions and conduct of the parties at and prior to the execution and delivery of the instrument. 
Bank of Ravenswood
, 256 Ill. App. 3d at 474; 
Pioneer Trust & Savings Bank v. Lucky Stores
, Inc.
, 91 Ill. App. 3d 573 (1980). In the present case, the trial court did not construe the demand nature of the note until after admission of parol evidence.

Examination of the consolidated note reveals that the words, "on demand" are prominent and typewritten in two places and included again in the note's form language. However, the note also includes three instances of form language, in what is best described as "fine print," mentioning terms of default that would trigger the bank's right to accelerate payment. In addition, other events of default are recited in the September 1980 security agreement which has been specifically incorporated by reference. 

Section 3-108 of the UCC as in effect at times pertinent to this action provided:

"Instruments payable on demand include those payable at sight or on presentation and those in which no time for payment is stated." Ill. Rev. Stat. 1983, ch. 26, par. 3-108.
(footnote: 1) 

The consolidated note contains no maturity date or definite time for payment. Rather, in each space where such a date would logically have been inserted if the note were intended to be a term note, the consolidated note contains the typed language "ON DEMAND." 

NWI argues that a maturity date can be implied by reference to the 1980 security agreement incorporated in the consolidated note and a collateral document generated by Edgewood in connection with the loan that states that the "repayment program" is a "5-year term." However, the present UCC, which codifies the law existing at the time of the loan (see 
Exchange National Bank v. Crest Finance Co.
, 53 Ill. App. 2d 255 (1964)), provides:

"If an instrument, payable at a fixed date, is also payable upon demand made before the fixed date, the instrument is payable on demand until the fixed date and, if demand for payment is not made before that date, becomes payable at a definite time on the fixed date." 810 ILCS 5/3-108(c) (West 1992). 

Edgewood argues that (1) either the demand language is  unambiguous, thus obviating the need for parol or extrinsic evidence, or (2) even if resort to such evidence is made, the demand language controls over the implied maturity date of five years.

Support for this conclusion is found in the UCC rule of construction that prioritizes typed language over form language. The UCC provision in effect at the time of this dispute provides: "Handwritten terms control typewritten and printed terms, and typewritten control printed." Ill. Rev. Stat. 1983, ch. 26, par. 3-118(b). See also 
3 A 
Corbin on Contracts
, sec. 548, at 182-83 (1960); 
Brzozowski v. Northern Trust Co.
, 248 Ill. App. 3d 95, 99 (1993) (where an ambiguity exists between a typed provision and the printed form, then the typed provision is to be given effect over the printed provision). NWI contends that this rule of construction is diluted since the 1980 security agreement is entirely typewritten and contains event of default language and the incorporation by reference is similarly typed so as to satisfy section 3-114. 

After considering the nature of the parties' agreement, we believe it to be sufficiently ambiguous 
to allow parol evidence to determine the intent of the parties as revealed by the their amicable and informal course of dealing. NWI argues that a demand instrument on the full $800,000 debt is out of place given the lenient manner Edgewood previously applied to NWI's loans, 
e.g.
, allowing the series of 90-day notes to be "rolled over," handshake deals, overnight loans of large sums of money and, as NWI notes, Bruning's "strong expression of faith in Robertson to LaSalle less than two months" before the loan was called. Moreover, the five-year term urged by NWI was allegedly discussed between Bruning and Robertson at a meeting held at the Flame Restaurant.

Accordingly, since the note appears to be ambiguous, the issue as to whether the parties intended that the instrument be a demand note must be submitted to the jury. Extrinsic evidence may be introduced to show the intent of the parties and resolve an ambiguity in a contract. 
Bank of Ravenswood
, 256 Ill. App. 3d at 474; 
Pioneer Trust & Savings Bank
, 91 Ill. App. 3d 573. If the intent of the parties can be determined from facts not in dispute, then the meaning of the contract can be determined by the court as a matter of law. 
Bank of Ravenswood
, 256 Ill. App. 3d at 474; 
Nerone v. Boehler
, 34 Ill. App. 3d 888 (1976). However, if the ambiguity can only be resolved by resort to facts in dispute, then the contract must be construed by the trier of fact. 
Bank of Ravenswood
, 256 Ill. App. 3d at 474; 
Nerone
, 34 Ill. App. 3d at 891; 
Vole, Inc. v. Georgacopoulos
, 181 Ill. App. 3d 1012 (1989). 

While NWI argues that the jury had all of the facts and inferentially had to decide that the note was not payable on demand, the trial court's various rulings and instructions to the jury did not allow the jury to specifically consider whether the note was a demand instrument. Since, at the very least, the note is ambiguous, the question becomes whether the jury properly considered the alternative that the note was a demand instrument.

(2) Whether the Jury Was Properly Instructed

Litigants are entitled to have the jury instructed on the legal principles applicable to the facts of the case. 
Wind v. Hy-Vee Food Stores, Inc
.
, 272 Ill. App. 3d 149, 154 (1995); 
Alden Press, Inc. v. Block & Co.
, 173 Ill. App. 3d 251, 260 (1988). The test of a jury instruction's propriety is whether it fairly and accurately states the law. 
Wind
, 272 Ill. App. 3d at 154; 
Korpalski v. Lyman
, 114 Ill. App. 3d 563, 568 (1983). The trial court's failure to give complete and correct instructions is error. 
Winn v. Inman
, 119 Ill. App. 3d 836, 840-41 (1983). A new trial will be granted where a party shows that its right to a fair trial has been seriously prejudiced by the denial of an instruction. 
Wade v. City of Chicago
 Heights
, 216 Ill. App. 3d 418, 423 (1991). The trial court's failure to give proper jury instructions is reversible error when the evidence is conflicting or the facts are closely balanced. 
Winn
, 119 Ill. App. 3d at 840. Prejudice results when the court fails to instruct the jury on an issue reasonably presented by the evidence. 
Ellig v. Delnor Community Hospital
, 237 Ill. App. 3d 396, 408 (1992).

Edgewood's instruction No. 14, rejected by the trial court, defined a demand note and then provided:

"If you find that the intention of the parties was that the Note and Security Agreement was to be a demand note, then you must find in favor of Edgewood Bank."

Edgewood's special interrogatory No. 1, also refused, asked the jury to answer the question; "Was the Note and Security Agreement dated October 31, 1983 a demand note?"

Edgewood argues that the trial court's failure to submit these instructions to the jury is error warranting a new trial. See 
Alden Press, Inc. v. Block & Co.
, 173 Ill. App. 3d 251, 269 (1988) (failure to give an instruction on a party's theory of the case, where the evidence supports such an instruction, is error).

A review of each instruction given to the jury reveals that the jury was 
not
 asked to determine whether the note was payable on demand. Since, we believe the note to be, at least ambiguous, the jury should have been given a full opportunity to resolve this ambiguity -- to decide whether the note was a demand or time instrument.  

As instructed, the jury could find that Edgewood breached the agreement if (1) Edgewood accelerated the note and demanded immediate and full payment without being reasonably insecure; (2) acted contrary to the parties' course of dealing; and (3) failed to act in good faith. However, if, with proper instructions, the note was found to be a demand instrument, Edgewood would (1) be entitled to demand full and immediate payment without the condition of reasonable insecurity; (2) it would not matter that the note's demand nature was contrary to the parties' established course of dealing; and (3) there would be no "good-faith" issues.  
See 
Shawmut Bank v. Miller
, 614 N.E.2d 668 (Mass. 1993).   
Edgewood is, accordingly, entitled to a new trial. See 
Wind
, 272 Ill. App. 3d at 157; 
Wade
, 216 Ill. App. 3d at 423.

An additional issue must be considered relating to the 
amicus
 
curiae
 brief filed by the Bankers Association. The trial court, in instructing the jury on the issue of "good faith," used an objective standard -- "how a reasonably careful person would act under those circumstances." 

The Bankers Association argues that Edgewood's conduct is to be measured by the subjective
 standard of good faith found in the UCC, which provides that "good faith" means "honesty in fact in the conduct or transaction concerned." 810 ILCS 5/1-201(19) (West 1992) (formerly Ill. Rev. Stat. 1983, ch. 26, par. 1-201(19)). As the supreme court noted in confirming that the good faith standard is a subjective one, an early draft of the UCC included an objective standard for good faith, which was eliminated in the final version. 
Watseka First National Bank v. Ruda
, 135 Ill. 2d 140, 150 (1990). Although this error is technical and probably had little effect on the jury's verdict, it is recognized as error.

(3) Damages

In an effort to facilitate retrial of this matter, we consider the question of damages. The jury awarded NWI $4.7 million in damages for lost profits from 1984 through 1992. The standard of review is whether the jury's verdict is against the manifest weight of the evidence. 
Wilmette Partners v. Hamel
, 230 Ill. App. 3d 248 (1992). An assessment of damages that does not meet the requisite degree of certainty is against the manifest weight of the evidence and should be reversed. 
Bowman v. Zimny
, 256 Ill. App. 3d 386 (1993).

There is a dearth of Illinois cases that address the proper measure of damages to be awarded for breach of a contract to lend money. A northern district of Illinois case observes that the "measure of damages for wrongful failure to lend money [breach] is the higher cost of alternative financing unless it is foreseeable to the lender that substitute financing will not be available. *** If it is foreseeable that substitute financing will not be available, the lender is liable for the foreseeable actual damages resulting from the breach." 
Lester v. Resolution Trust Corp.
, 125 B.R. 528, 532 (N.D. Ill. 1991); see also Restatement (Second) of Contracts sec. 351, Comment 
e
 (1981); 
Hill v. Ben Franklin Savings & Loan Ass'n
, 177 Ill. App. 3d 51 (1988).

Thus, if it were 
not
 foreseeable that NWI would be unable to secure alternative financing, Edgewood would only be liable for the difference between the cost of any alternative financing and the cost of financing under the agreement between NWI and Edgewood -- prime plus 1%. If, on the other hand, it 
was
 foreseeable that NWI would be unable to secure alternative financing, Edgewood would be liable for "the foreseeable actual damages resulting from the breach." The issue of foreseeability, therefore, is a question of fact for the jury and the jury should have been so instructed.

Here, t
he trial court refused Edgewood's instruction No. 20, which would have told the jury:

"If you find that Edgewood Bank breached the note and Security Agreement, you may consider damages for loss of profits only if you find that it was foreseeable to Edgewood Bank that substitute financing would not be available at the time of the breach."

This is an accurate statement of the law and one which the jury should have received. Instead, the jury was instructed:

"If you decide for NWI International, Inc. on its complaint for breach of contract, you must fix the amount of money which will reasonably compensate NWI for all losses naturally arising from the breach. In calculating NWI's damages, taking into consideration the nature, extent and duration of the damage, you should determine the sum of money that will put NWI in as good a position as it would have been if both NWI and Edgewood had performed all of their promises under the contract. The elements of damages claimed by NWI in this case are:

-- The Cost of Alternate Financing

-- The Loss of Profits

Whether these elements of damages have been proved by the evidence is for you to determine."

A new trial, with the jury properly instructed on the nature of the note and the issue of damages, is required. Because a new trial is here granted, we will not consider the issue of whether the verdict was speculative and against the manifest weight of the evidence. 
Midland Hotel Corp. v. Reuben H. Donnelley Corp.
, 118 Ill. 2d 306 (1987).

(4) The Cross-Appeal

At the first trial, the trial court directed verdicts in favor of Edgewood on the conversion count and in favor of Edgewood and Bruning individually on the claim for intentional interference with economic advantage. The second trial court refused to vacate these verdicts. We affirm.

A verdict should be directed only where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." 
Pedrick v. Peoria & Eastern R.R. Co.
, 
37 Ill. 2d 494, 510 (1967). The trial court's ruling on a motion for directed verdict will not be reversed absent an abuse of discretion. 
Cohen v. Garretson
, 282 Ill. App. 3d 248 (1996). In the present case, we find no abuse of discretion and affirm the trial court's order directing the verdicts in favor of Edgewood.

For the reasons set forth above, we affirm the directed verdicts in favor of Edgewood and reverse and remand on the contract claim.

Affirmed in part; reversed in part and remanded.

THEIS, J., and QUINN, J., concur.

FOOTNOTES
1: As Edgewood observes, while the statute in effect in 1983 does not explicitly state that a note payable "on demand" is a demand note, such is clearly implicit. As the Oregon Supreme Court found in referring to the identical language in its statute, "[t]he drafters obviously felt no need to state the obvious, that demand instruments also include instruments made expressly 'payable on demand'." 
Seattle-First National Bank v. Schriber
, 580 P.2d 1012, 1013 (Or. 1978).