April 29, 1999

No. 4-98-0067

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

SHIRLEY SPAIN, Individually and as ) Appeal From

Executrix of the Estate of MARSHAL L. ) Circuit Court of

SPAIN, JR., Deceased, ) Macon County

Plaintiffs-Appellees, ) No. 88L79

v. ) 

OWENS CORNING FIBERGLASS CORPORATION, )

a Delaware Corporation, )

Defendant-Appellant, ) 

and )

THE CELOTEX CORPORATION, a Delaware )

Corporation, KEENE CORPORATION, a )

Delaware Corporation, PITTSBURGH )

CORNING CORPORATION, a Delaware )

Corporation, SOUTHERN ASBESTOS, a )

Delaware Corporation, RAYMARK )

INDUSTRIES, INC., a Delaware )

Corporation, FIBREBOARD CORPORATION, )

a Delaware Corporation, OWENS- )

ILLINOIS, INC., f/k/a OWENS-ILLI­NOIS )

GLASS COMPANY, an Ohio Cor­poration, )

FLINKOTE COMPANY, a Delaware )

Corporation, and A.E. STALEY COMPA­NY, ) Honorable

a Delaware Corporation, ) John K. Greanias,

Defendants. ) Judge Presid­ing.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

Plaintiff, Shirley Spain, as administrator of the es­tate of her husband, Marshal L. Spain (decedent), sued nu­mer­ous manufac­

turers of asbestos-containing prod­ucts, in­clud­ing Owens Corn­ing Fi­

ber­glass Corporation (OC).  Her com­plaint al­leged the manufacturers were responsible for decedent's inju­ries and later death.  Be­fore trial, all de­fen­dants but OC settled or were dis­missed.  A jury re­turned a ver­dict against OC, award­ing plain­tiff $1.8 mil­lion.

OC ap­peals, argu­ing (1) the evidence estab­lish­ing prox­i­mate cause was insuf­ficient as a matter of law; (2) the trial court erred when it prohib­ited OC from introducing evidence of decedent's expo­sure to other manufacturers' asbestos; (3) plain­tiff opened the door to ad­mis­sion of decedent's expo­sure to other manufacturers' asbes­tos; (4) the court abused its dis­cre­tion when it refused OC's prox­i­mate cause in­struc­tion; and (5) the court erred when it re­

fused to grant a new trial or a re­mitti­tur.  We affirm.

I. BACKGROUND

Decedent died in June 1988 of complications from meso­thelioma, an asbestos-related lung disease.  Be­fore tri­al, OC moved 
in
 
limine
 re­questing it be al­lowed to pres­ent evi­dence of decedent's other exposures to asbes­tos prod­ucts not manufac­tured by OC.  OC al­leged this evidence sup­ported its de­fense a third party was the sole prox­i­mate cause of decedent's injury and death.  The court denied the motion.

At the September 1997 trial, a portion of decedent's vid­eo-

record­ed depo­si­tion was played for the jury.  He stated he began work­ing at A.E. Staley grain pro­cess­ing plant in Decatur, Illi­nois, in January 1957.  After six months, he was as­signed to build­ing number nine, the feed house, where he oper­ated and main­tained the grain dryers.

Decedent stated the feed house was six stories tall with miles of piping running through it, a third of which was insulated, and he worked near or di­rect­ly with other ma­chin­ists work­ing on the pipes.  When the machin­ists worked on the pipes, they would strip off and replace the old insu­la­tion.  Fre­quent­ly, decedent was stand­ing within two to three feet of them during this process and he would get dusty.  Dece­dent also stated the ma­chin­ists used round pipe and sheet insu­la­tion, both of which created dust when cut.

Decedent indicated the work was part of his regu­lar rou­tine during the 1960s and 1970s.  During this time, he saw OC's insulation boxes in the feed house.  Before re­tiring in 1986, he began hav­ing trou­ble breath­ing.  Short­ly there­af­ter, an opera­tion re­vealed tu­mors along decedent's lungs.

OC sought to admit decedent's testi­mony con­cern­ing his other exposures to asbestos, including his experiences working as a pipefitter's helper for Wabash Rail­road and re­mov­ing old as­bes­tos-

contain­ing fire­brick from Staley's grain dry­ers with­out a mask or res­pira­tor.  The court re­fused to admit this evi­dence pursuant to 
Lipke v. Celotex Corp.
, 153 Ill. App. 3d 498, 509, 505 N.E.2d 1213, 1221 (1987).

Dr. Michael Zia, decedent's pulmonologist, diag­nosed him with mesothelioma.  Dr. Zia tes­ti­fied meso­the­li­oma can be at­tribut­ed to a single exposure to as­bestos and oc­curs when an as­bes­tos fiber pene­trates the lung and reach­es the pleu­ra.  How­ev­er, due to the lung's abil­i­ty to remove for­eign parti­cles, meso­the­lioma is like­ly to re­sult from an in­tense expo­sure, start­ing in one spot and spread­ing.  Dr. Zia stat­ed the more as­bes­tos a per­son is ex­posed to the great­er the risk of develop­ing meso­the­lio­ma.  OC sought to admit Dr. Zia's tes­timo­ny con­cern­ing decedent's asbestos expo­sure at Wabash.  The court re­fused OC's request.  See 
Lipke
, 153 Ill. App. 3d at 509, 505 N.E.2d at 1221.

Dr. Gerald Kerby, the defendant's expert pulmonologist, provided a similar summary of mesothelioma's cause.  Dr. Kerby also stated meso­the­lioma has a latency period of 20 to 40 years. OC sought to admit Dr. Kerby's opinion concerning decedent's asbestos expo­sure at Wabash.  The court again re­fused.  See 
Lipke
, 153 Ill. App. 3d at 509, 505 N.E.2d at 1221.

Dr. Joel Bender, OC's vice-president of health sciences and chief medical officer, testified (1) particles of asbestos can be invisible to the naked eye, (2) meso­the­lioma is rare among per­sons not exposed to as­bestos, (3) the maxi­mum dis­tance as­bes­tos fi­bers can travel through the air and the level of as­bes­tos expo­sure at which meso­thelio­ma will not occur are not known, (4) as­bes­tos fi­

bers can be carried by ex­posed work­ers throughout a work site, and (5) all of a person's expo­sure to as­bestos can be im­plicat­ed as the cause of an asbes­tos dis­ease.

Dr. Jon Konzen, medical director at OC from 1968 to the early 1990s, stated OC knew asbestos dust was hazardous to humans since the 1940s.  However, OC did not warn the pub­lic until 1976 or 1977, after it stopped adding as­bestos to its insu­la­tion prod­ucts.  Other tes­timo­ny re­vealed dur­ing the 1950s, 1960s, and 1970s, OC manufactured Kaylo pipe insu­la­tion (Kaylo), which con­tained 12% to 22% as­bes­tos.  Also, cut­ting Kaylo re­leased as­bes­tos dust into the air.

Ellis Carlton testified he worked for Sprinkmann Insu­la­tion, an au­tho­rized dis­trib­u­tor of OC's prod­ucts, from 1958 to 1994.  Carlton stated Sprinkmann sold more OC insu­la­tion dur­ing the 1960s and 1970s than any other brand.  Sprinkmann sold OC's insu­lation to Staley's during this time.

Wesley Klein, a truck driv­er for Sprinkmann, stated he made at least 20 trips to Staley's during the 1960s and 40 to 50 trips during the 1970s.  Klein hauled Kaylo and block insu­la­tion.  The insulation was either immedi­ately ap­plied by Sprinkmann's pipefitters or Staley's em­ploy­ees, or it was stored at Staley's.  Klein hauled more Kaylo than any other pipe insulation.  Rus­sell Wolstenholme, anoth­er driver for Sprinkmann, stated he de­liv­ered insulation, including Kaylo, to Staley's and made more than 50 trips from 1954 to 1964.

Ray Virden, who worked for Staley's from 1955 to 1995, stated he and decedent worked togeth­er in the feed house.  The feed house was four stories tall, 200 feet or more wide, and full of steam lines.  The doors and win­dows of the feed house were fre­quently left open, and dust was visi­ble in the air.  The feed house's interior was wide open, except for a few ma­chines and grain dryers.  Virden indi­cated the steam pipes were cov­ered with insula­tion and he wit­nessed insula­tion being re­moved, re­placed, or re­paired on several occasions.

Ellis Long, an insulator for Sprinkmann during the 1960s and 1970s, testified he installed more Kaylo at Staley's than any other product.  He stated work­ing with Kaylo created dust, which was visible on his hair and cloth­ing.  Fur­ther, Long specifically recalled one inci­dent when he in­stalled Kaylo in the feed house.  On cross-exam­i­nation, Long stat­ed he did not re­call re­moving insu­

la­tion at Staley's and he as­sumed he used Kaylo in the feed house be­cause it was the prod­uct Sprinkmann pre­ferred.

At the close of plaintiff's case and at the end of the tri­al, OC moved for di­rect­ed ver­dict, argu­ing plain­tiff failed to prove causa­tion.  The court de­nied both mo­tions.  The jury re­turned a verdict for plaintiff, awarding her $1.8 million in damages on which the court en­tered judg­ment.  OC filed a time­ly posttrial mo­

tion for judgment 
n.o.v.
 or for a new trial, which the court de­

nied.  This ap­peal followed.

II. ANALYSIS

A. Proximate Cause

OC asks this court to reverse the trial court's deni­al of its motion for directed ver­dict or judg­ment 
n.o.v.
  OC alleg­es the evidence failed to prove its product was the proximate cause of decedent's inju­ry, so the issue should not have been pre­sent­ed to the jury.  See 
Thacker v. UNR Indus­tries, Inc.
, 151 Ill. 2d 343, 359-60, 603 N.E.2d 449, 457 (1992).  OC con­tends the evi­dence failed to link Kaylo to de­fen­dant's workplace.  See 
John­son v. Owens-Corn­ing Fi­ber­glass Corp.
, 284 Ill. App. 3d 669, 676-77, 672 N.E.2d 885, 890 (1996).

A motion for directed verdict or judgment 
n.o.v.
 will be granted only if all the evidence so overwhelmingly fa­vors the mov­

ant no contrary verdict could stand.  On re­view of the trial court's judgment deny­ing the mo­tion, the evi­dence is exam­ined in the light most favor­able to the party op­pos­ing the mo­tion.  See 
Thacker
, 151 Ill. 2d at 353-54, 603 N.E.2d at 454.

Plaintiff bore the burden to produc­e evi­dence es­tab­lish­ing OC's product was the cause of decedent's inju­ries.  Cau­sa­tion evi­

dence may be direct or circum­stantial; howev­er, the lat­ter must not be based on mere specula­tion or conjec­ture.  See 
Johnson
, 284 Ill. App. 3d at 673, 672 N.E.2d at 888.  To prove proximate cause in as­

bes­tos cas­es, the evi­dence must show the dece­dent (1) worked in an area where OC's as­bes­tos-con­taining products were frequently used and (2) the dece­dent worked suffi­cient­ly close to this area so as to come into contact with OC's products.  
Thacker
, 151 Ill. 2d at 359, 603 N.E.2d at 457.

In 
Johnson
, decedent, who died from lung can­cer, worked for Key­stone Steel and Wire Company for over 35 years.  After his death, his wife sued numerous defen­dants who sup­plied Key­stone with asbes­tos-containing products.  On ap­peal, the court re­viewed the trial court's deci­sion grant­ing summa­ry judg­ment to some of the de­

fen­dants.  In af­firm­ing sum­ma­ry judg­ment for Zoltek Corpo­ra­tion, the ap­pel­late court found no evi­dence indi­cat­ing where Zoltek's prod­ucts were used.  Thus, plain­tiff was un­able to es­tablish even a mini­mum level of contact with Zoltek's asbes­tos.  
John­son
, 284 Ill. App. 3d at 677, 672 N.E.2d at 891.

In reversing summary judgment for A.P. Green In­dus­tries, Inc., the court relied on evidence establishing A.P. Green's asbes­tos was used regu­lar­ly in the mill where dece­dent worked, and when used, clouds of dust would rise ex­pos­ing em­ploy­ees to the asbestos.  The court found decedent's expo­sure to the as­bes­tos dust cre­ated a tri­

able issue of fact.  See 
John­son
, 284 Ill. App. 3d at 678, 672 N.E.2d at 891.

In affirming summary judgment for A&M Insula­tion Compa­ny, the court re­viewed records showing A&M sold asbes­tos prod­ucts to Key­

stone.  However, the court failed to find evi­dence sup­port­ing the in­fer­ence the prod­ucts were used in a man­ner ex­posing decedent to as­bes­tos.  With­out this evi­dence, plain­tiff's claim could not suc­

ceed.  See 
John­son
, 284 Ill. App. 3d at 679, 672 N.E.2d at 892.

Here, the evi­dence es­tab­lished (1) dece­dent worked in the feed house for over 28 years; (2) machinists removed and installed pipe insu­la­tion, in­clud­ing Kaylo, near decedent's workplace; (3) Kaylo con­tained 12% to 22% as­bes­tos; (4) when cut, Kaylo cre­ated asbestos dust, which was visi­ble in the air; and (5) meso­the­li­oma is rare among people not ex­posed to asbes­tos.  Thus, the jury could rea­son­

ably con­clude Kaylo's as­bes­tos dust caused decedent's meso­theli­oma.

OC con­tends decedent's tes­ti­mony he saw boxes of mate­rial around his work area bearing OC's name was in­suffi­cient to satisfy the proximity requirement under 
Thacker
 be­cause dece­dent did not know whether the boxes con­tained Kaylo or fi­berglass insu­la­tion.  OC also as­serts Long's tes­timo­ny was insufficient to satisfy the proximity requirement because Long was not absolutely sure he in­

stalled Kaylo in the feed house.

While Long's uncertainty affects his cred­i­bil­i­ty as a wit­ness, credi­bility is for the trier of fact to weigh, and its deci­sion will not be dis­turbed on re­view un­less mani­festly erro­ne­ous.  See 
Gaines v. Townsend
, 244 Ill. App. 3d 569, 575, 613 N.E.2d 796, 801 (1993).  Here, Long specifically recalled in­stalling insu­lation, which he believed was Kaylo, in the feed house.  His state­ments were cor­rob­o­rat­ed by evi­dence es­tab­lish­ing Kaylo was deliv­ered to Staley's, steam pipes in the feed house were cov­ered with insula­

tion, and pipe insula­tion was re­moved and re­placed in the feed house on a regu­lar basis.  The jury could reason­ably be­lieve Long in­stalled Kaylo in the feed house.

Moreover, Long's testimony is not the only evidence link­ing Kaylo to decedent's work area.  This court has pre­vi­ous­ly con­clud­ed reli­able ex­pert evi­dence of fiber drift may be used to es­tab­lish the prox­imity prong of the 
Thacker
 test.  Fiber drift evi­dence will sup­port an infer­ence of causa­tion if it is accompa­nied by evi­dence estab­lishing how fre­quently the asbes­tos product was used, the area in which it was used, and the regular­ity of decedent's em­ployment within a zone covered by the reach of the fiber drift.  See 
Wehmeier v. UNR Industries, Inc.
, 213 Ill. App. 3d 6, 31, 572 N.E.2d 320, 337 (1991).

In 
Wehmeier
, this court stated the relevance of the fiber drift theory to causation depends upon many fac­tors, in­cluding the type of asbestos disease and the descrip­tion of the actual workplace.  This court found "[w]here there is com­pe­tent evi­dence that one or a 
de
 
minimus
 [
sic
] num­ber of as­bes­tos fi­bers can cause injury, a jury may conclude the fibers were a substan­tial factor in causing a plaintiff's inju­ry."  
Wehmeier
, 213 Ill. App. 3d at 31, 572 N.E.2d at 337.

The Su­preme Court of Illinois later adopt­ed the fiber drift theo­ry, hold­ing it is ap­plicable only if the plain­tiff can show the defendant's as­bes­tos was "ac­tu­ally inhaled by the dece­dent."  
Thacker
, 151 Ill. 2d at 364, 603 N.E.2d at 459.  In 
Thacker
, the evi­dence showed defendant's as­bes­tos con­trib­uted to the dust in the air where defendant worked.  The supreme court held this evidence was suf­fi­cient to sat­isfy the prox­imity test based on the po­tent nature of as­bes­tos and the fact working with as­bes­tos gen­erat­ed dust.  
Thacker
, 151 Ill. 2d at 364-65, 603 N.E.2d at 459.

Here, expert testimony estab­lished (1) as­bes­tos par­ti­cles are in­visi­ble to the naked eye; (2) as­bes­tos dust drifts through the air; and (3) mesothelioma can be con­tract­ed from a sin­gle expo­sure to as­bes­tos fi­bers.  Other nonex­pert tes­ti­mo­ny re­vealed (1) the feed house was an open envi­ron­ment with few inte­rior walls; (2) ma­

chin­ists regu­larly re­placed and in­stalled new pipe insulation, including Kaylo, in the feed house; (3) Kaylo pro­duced dust when cut; and (4) dust was visible in the feed house.  Based on the fact decedent worked in the feed house for 28 years, this evi­dence sup­

ports the fiber drift theo­ry, there­by sat­isfy­ing the prox­imity requirement.

B. Sole Proximate Cause Defense

OC objects to the trial court's refusal to admit evi­dence on decedent's other expo­sures to as­bes­tos.  Spe­cif­i­cal­ly, OC con­tends the court prejudiced it by pro­hib­iting evi­dence sup­port­ing the defense a third party was the sole prox­i­mate cause of decedent's inju­ry.  See 
Leonardi v. Loyola Uni­ver­sity
, 168 Ill. 2d 83, 93-94, 658 N.E.2d 450, 455 (1995).

Normally, a trial court's decision to exclude or admit evi­

dence is reviewed for an abuse of discretion.  
Baird v. Adeli
, 214 Ill. App. 3d 47, 68, 573 N.E.2d 279, 292 (1991).  Here, how­ev­er, the court excluded the proposed evidence based solely on its read­

ing of 
Lipke
, 153 Ill. App. 3d at 509, 505 N.E.2d at 1221.  As the parties do not dispute the facts, we re­view this issue 
de
 
novo
.  See 
Farm­ers State Bank v. Neese
, 281 Ill. App. 3d 98, 101, 665 N.E.2d 534, 536 (1996).

In 
Lipke
, the ap­pel­late court held a party "'guilty of negli­

gence cannot avoid responsi­bility merely because another per­son is guilty of negli­gence contribut­ing to the same injury.'"  
Lipke
, 153 Ill App. 3d at 509, 505 N.E.2d at 1221, quoting 
Sears v. Kois Brothers Equipment, Inc.
, 110 Ill. App. 3d 884, 889, 443 N.E.2d 214, 219 (1982).  Thus, the fact dece­dent was ex­posed to a num­ber of dif­fer­ent asbestos prod­ucts did not re­lieve the de­fen­dant of lia­bil­ity for the inju­ry.  Ac­cord­ingly, the court prohib­ited evi­

dence of the decedent's other expo­sures to asbes­tos.  
Lipke
, 153 Ill. App. 3d at 509, 505 N.E.2d at 1221.

In 
Leonardi
, plaintiffs, administrators of decedent's estate, brought a medical malpractice action against numerous de­fen­dants.  The complaint sought damages for negligence resulting from a Ce­sar­

e­an sec­tion.  Before the trial began, decedent's at­tend­ing phy­si­

cian, a defendant, died and his es­tate set­tled.  Plaintiffs later moved 
in
 
limi­ne
 to bar evi­dence of the alleged negli­gence of any per­son other than the named de­fen­dants.  The court denied the mo­

tion and al­lowed the defen­dants to ques­tion witnesses re­gard­ing the at­tend­ing physician's stan­dard of care.  
Leonardi
, 168 Ill. 2d at 90-92, 658 N.E.2d at 454-55.  

On appeal, plaintiffs argued the court erred by denying their motion 
in
 
limine
 based on the common law principle there can be more than one proximate cause of the injury, and a per­son is liable for his or her negligent conduct whether it con­tributed wholly or partly to the plaintiff's injury 
as
 
long
 
as
 
it
 
was
 
one
 
of
 
the
 
proximate
 
causes
 
of
 
the
 
injury
.  "Thus, evi­dence of an­oth­er person's liability is irrelevant ***."  
Leonardi
, 168 Ill. 2d at 93, 658 N.E.2d at 455, citing 
Kochan v. Owens-Corn­ing Fiber­glass Corp.
, 242 Ill. App. 3d 781, 788-89, 610 N.E.2d 683, 688 (1993).

The su­preme court found the 
Lipke
 rul­ing inap­pli­ca­ble, stating the 
Lipke
 court's rationale pre­sumed the defendant's con­duct was at least a prox­i­mate cause of the inju­ry.  In 
Leonardi
, the defendants' answer denied they were even part­ly a prox­imate cause of the decedent's injury; in­stead, their defense theory was decedent's attending physician was the sole prox­imate cause of the injury.  Based on this de­fense, de­fen­dants could in­tro­duce evi­dence a third party was the sole prox­i­mate cause of the inju­ry.  
Leonardi
, 168 Ill. 2d at 94, 658 N.E.2d at 455.

The 
Leonardi
 court found the 
Lipke
 stan­dard inap­pli­cable to medical malpractice cases, but did not change the law gov­ern­ing asbestos cases.  Because as­bes­tos-re­lat­ed dis­eas­es cannot be linked to one fi­ber or a par­ticu­lar de­fen­dant, Illi­nois courts have long rec­og­nized the difficulty in de­ter­min­ing whether a spe­cific as­bes­

tos exposure caused or con­trib­uted to a person's as­bestos-induced inju­ry or death.  Thus, to as­sist plain­tiffs in proving proximate cause, the supreme court adop­ted the "fre­quen­cy, regu­lari­ty and proxim­ity," or "
de
 
minimis
," test in 
Thacker
.  See 
Kochan
, 242 Ill. App. 3d at 790, 610 N.E.2d at 688-89.

Once plain­tiff satisfied the 
Thacker
 test, OC is pre­sumed to be a prox­i­mate cause of dece­dent's asbes­tos inju­ry.  See 
Thacker
, 151 Ill. 2d at 360, 603 N.E.2d at 457; 
Johnson
, 284 Ill. App. 3d at 676, 672 N.E.2d at 890.  Illi­nois law then re­quires the trier of fact to inde­pen­dent­ly evalu­ate whether Kaylo was a sub­stan­tial fac­

tor in caus­ing decedent's inju­ry, there­by making evi­dence of other as­bes­tos expo­sures ir­rele­vant.  See 
Tragarz v. Keene Corp.
, 980 F.2d 411, 425 (7th Cir. 1992).  OC can rebut the pre­sumption by prov­ing (1) dece­dent was not exposed to its prod­uct, (2) his expo­

sure was insuffi­cient to cause inju­ry, or (3) its prod­uct con­tained too low an amount of asbes­tos to be hazard­ous.  See 
Kochan
, 242 Ill. App. 3d at 790, 610 N.E.2d at 689.

Allowing OC to admit evi­dence of decedent's other as­bes­tos expo­sures would con­fuse the jury.  However, OC may in­tro­duce such evidence if it files con­tri­bu­tion actions against the other manu­

fac­tur­ers alleg­edly re­spon­si­ble for the injury.  This evi­dence is then limited to exposures from those other manu­fac­turers named in the contribution actions.  Only then can the jury inde­pen­dent­ly eval­u­ate wheth­er each manufacturer's prod­uct was a sub­stan­tial fac­

tor in caus­ing decedent's injury.  H­ere, by not fil­ing contri­bu­tion ac­tions against the other manufactur­ers of as­bestos-con­tain­ing products, OC was barred from ad­mit­ting any evi­dence con­cern­ing decedent's other expo­sures.

C. Waiver of 
Lipke
 Rule

OC asserts plaintiff waived the court's 
Lipke
 ruling when her at­tor­ney made re­peat­ed ref­er­enc­es to decedent's cumula­tive expo­sure to asbes­tos.  OC con­tends plaintiff's counsel's opening statement and cross-exami­na­tion of Dr. Kerby alluded to all of decedent's asbestos exposures, thereby confusing cau­sa­tion with risk anal­y­sis.  OC asserts it could in­tro­duce evi­dence of other asbestos expo­sures be­cause plain­tiff "opened the door."  See 
Kochan
, 242 Ill. App. 3d at 790, 610 N.E.2d at 689.

The 
Kochan
 court noted a plaintiff incurs a risk by not introducing evidence of other exposures because, if the evidence shows only a minimal exposure to defendant's product, plaintiff's ex­pert may ap­pear fool­ish tes­ti­fy­ing such a mini­mal expo­sure caused the disease.  However, when the plaintiff at­tempts to bol­ster the expert's opin­ion with evi­dence of other expo­sures, he or she opens "the door to defendant's 
argument
 that it was plaintiff's expo­sure to other products that caused plaintiff's injury."  (Emphasis add­

ed.)  
Kochan
, 242 Ill. App. 3d at 790, 610 N.E.2d at 689.

First, we note the 
Kochan
 court's state­ments are 
dic­ta
.  Second, these 
dicta
 do not permit OC to intro­duce evi­dence of decedent's other exposures; rather, they allow OC to 
argue
 its prod­uct was not responsi­ble.  As 
Kochan
 st­ated, the ques­tion for the jury re­mains con­sis­tent through­out the tri­al, 
i.e.
, wheth­er the evi­dence was suffi­cient to prove a par­tic­u­lar defendant's asbes­tos-

con­taining prod­uct caused the injury.  
Kochan
, 242 Ill. App. 3d at 790, 610 N.E.2d at 689.  Any argu­ment based on the ef­fects of third-party as­bestos is ir­rele­vant and in­tended to con­fuse the jury.

D. OC's Jury Instruction

The court refused to give the fol­low­ing proximate cause in­

struc­tion of­fered by OC:

"When I use the expression proximate cause, I mean a cause which in natural and probable sequence produced the injury complained of.  
For
 
a
 
particular
 
product
 
to
 
be
 
a
 
proximate
 
cause
 
of
 
decedent's
 
injury
 
or
 
death,
 
there must
 
be
 
evidence
 
of
 
exposure
 
to
 
that
 
particu­lar
 
product
 
on
 
a
 
regular
 
basis,
 
over
 
an
 
extended
 
period
 
of
 
time,
 
in
 
proximity
 
to
 
where
 
the
 
decedent
 
actually
 
worked.
  It need not be the only cause nor the least or nearest cause.  It is sufficient if it concurs with some other cause acting at the same time which, in combi­nation with it, cause the injury."  (Emphasis added.)

OC contends most of the in­struc­tion fol­lows Illi­nois Pat­tern Jury Instruction, Civil, No. 15.01, at 79 (3d ed. 1995), while the rest com­plies with the proximate cause stan­dard set forth in 
Thacker
 (see 151 Ill. 2d at 358-59, 603 N.E.2d at 456-57).  OC asserts the court abused its dis­cre­tion by re­fusing the in­struc­tion.  See 
NWI Inter­national, Inc. v. Edgewood Bank
, 291 Ill. App. 3d 247, 258, 684 N.E.2d 401, 408 (1997).

Parties are entitled to have the jury instructed on their theories and the issues presented.  Wheth­er to give an in­struc­tion is within the discretion of the trial court.  
Wilkerson v. Pitts­

burgh Corn­ing Corp.
, 276 Ill. App. 3d 1023, 1031, 659 N.E.2d 979, 985 (1995).  In 
Wilkerson
, this court re­jected the same argument by a de­fendant who offered a simi­lar in­struc­tion.  The in­struc­tion lifted lan­guage from this court's opin­ion in 
Wehmeier
, 213 Ill. App. 3d at 28, 572 N.E.2d at 335.  See 
Wilkerson
, 276 Ill. App. 3d at 1033, 659 N.E.2d at 986.  The 
Wilkerson
 court con­clud­ed "the 'prac­tice of lift­ing sen­tenc­es from court opin­ions and con­verting them into in­struc­tions *** is not a good one, as it often leads to seri­ous er­ror.'"  
Wilkerson
, 276 Ill. App. 3d at 1033-34, 659 N.E.2d at 986, quot­ing 
Kingston v. Turn­er
, 115 Ill. 2d 445, 460, 505 N.E.2d 320, 326 (1987).

OC asserts its instruction was nec­es­sary be­cause plaintiff's trial strat­egy at­tacked the validi­ty of the "frequen­cy, regulari­ty and prox­imi­ty" stan­dard.  Howev­er, inclusion of the 
Thacker
 test, without explanation of the terms "fre­quent­ly," "prox­imity," and "regularity," does not clar­i­fy proxi­mate cause, but could lead to fur­ther confu­sion.  More­over, OC was not pre­cluded from 
argu­ing
 expo­sure to its as­bestos was not suf­fi­ciently fre­quent, regu­lar, or proxi­mate to cause decedent's inju­ry.  The court did not abuse its discretion in re­jecting OC's in­struc­tion.

E. Denial of New Trial or Remittitur

OC asserts the jury's verdict was based on passion and prejudice and not properly supported by evidence.  OC argues the court was required to set aside the verdict and order a new trial or a remittitur.  See 
Haid v. Tin­gle
, 219 Ill. App. 3d 406, 411, 579 N.E.2d 913, 916-17 (1991).  Specifi­cally, OC con­tends the court erred by (1) pro­hib­iting OC from ques­tion­ing Dr. Zia about the decedent's re­duced life expec­tancy due to smok­ing, hyperten­sion, and heart dis­ease, and (2) ad­mit­ting let­ters and cards written by dece­dent to plain­tiff.

1. 
Dr.
 
Zia's
 
Testimony

Prior to Dr. Zia testifying, plaintiff stated dece­dent smoked a pack and a half of cigarettes per day.  Plaintiff in­tro­duced life ta­bles show­ing an aver­age 60-year-old white male would be ex­pected to live another 18 years.  There­af­ter, Dr. Zia tes­ti­fied non­smok­ers out­live smok­ers on aver­age, but he did not know the life expec­tancy of a 60-year-old white male who smoked.

During cross-examination, OC questioned Dr. Zia about decedent's health problems and their effects on his life ex­pec­tan­

cy.  Plain­tiff suc­cess­ful­ly ob­ject­ed to these ques­tions as beyond the scope of direct exami­na­tion.  OC then subpoe­naed Dr. Zia to ap­

pear as a defense wit­ness.  Again, plain­tiff suc­cessful­ly ob­ject­ed to the testimony on the basis it con­sti­tuted an un­dis­closed ex­pert opin­ion.  See 166 Ill. 2d R. 213(g); 
Depart­ment of Trans­por­tation v. Crull
, 294 Ill. App. 3d 531, 537, 690 N.E.2d 143, 147 (1998).  OC contends Dr. Zia could be ques­tioned about decedent's medi­cal con­di­tions and his life ex­pec­tancy with­out being dis­closed under the treating physician excep­tion.

In 
Boatmen's Na­tional Bank v. Martin
, 155 Ill. 2d 305, 323, 614 N.E.2d 1194, 1203 (1993), the supreme court held treat­ing physi­cians are not subject to disclosure "[b]ecause [based on] a treating physician's relationship to the case, no sur­prise could be rea­sonably generated by his expert opinion testimony."   The court looked to Rule 220(b)(1), which states "the identity of an expert who is retained to render an opinion at trial on behalf of a party must be disclosed by that party" (134 Ill. 2d R. 220 (b)(1)), and held the par­ties should as­sume the treat­ing phy­si­cian would form an opin­ion based on his in­volve­ment in the under­lying facts.  
Boatmen's
, 155 Ill. 2d at 323, 614 N.E.2d at 1203.

Prior to its decision in 
Boatmen's
, the su­preme court stat­ed treat­ing physicians are not typically re­tained to render an opin­ion at trial but are consult­ed whether or not liti­gation is pend­ing or contemplated.  Hence, treating phy­si­cians are not sub­ject to Rule 220's disclo­sure requirements.  See 
Tzystuck v. Chi­ca­go Transit Au­

thor­i­ty
, 124 Ill. 2d 226, 234-37, 529 N.E.2d 525, 528-29 (1988).

However, the supreme court repealed Rule 220 (see Offi­cial Reports Advance Sheet No. 20 (Sep­tember 27, 1995), R. 220 (eff. January 1, 1996)) and amend­ed Rule 213 to in­clude dis­cov­ery and dis­clo­sure of opin­ion wit­ness­es, omitting the phrase it pre­vi­ously interpreted to create the treat­ing phy­si­cian exception (see 166 Ill. 2d R. 213; 
Tzystuck
, 124 Ill. 2d at 234, 529 N.E.2d at 528).  Sub­sec­tion (g) of Rule 213 re­quires OC to dis­close the sub­ject mat­

ter, conclusions, opinions, quali­fica­tions, and all reports of a witness who will offer 
any
 opin­ion testimo­ny.  See 
Crull
, 294 Ill. App. 3d at 536, 690 N.E.2d at 146.  By elimi­nat­ing the phrase "re­

tained to render an opinion at tri­al," we con­clude the supreme court intended to eliminate the "re­tained" ver­sus "nonretained" dis­tinction (see 
Boatmen's
, 155 Ill. 2d at 325, 614 N.E.2d at 1204) from the discov­ery re­quire­ments.  Rule 213 is intend­ed to avoid sur­prise by re­quir­ing the subject matter of 
all
 
opin­ions
 
be
 
dis­

closed
 and pro­hibit­ing any new or addition­al opin­ions un­less the interests of jus­tice re­quire oth­er­wise.  See 166 Ill. 2d R. 213(g), Com­mittee Comments, at lxxviii.  Thus, the treat­ing physician ex­

ception no lon­ger ex­ists.

The rules on dis­cov­ery are man­da­to­ry rules of pro­ce­dure.  See 
Crull
, 294 Ill. App. 3d at 537, 690 N.E.2d at 147.  Rule 213's purpose is clear.  To allow ei­ther party to ig­nore the rule's plain lan­guage de­feats its pur­pose and en­cour­ages tac­tical games­man­ship.  See 
Chicago & Illi­nois Midland Ry. Co. v. Crystal Lake Industrial Park, Inc.
, 225 Ill. App. 3d 653, 658, 588 N.E.2d 337, 341 (1992).  Although Dr. Zia's opin­ion was rele­vant to cau­sa­tion and damages (see 
Wehmeier
, 213 Ill. App. 3d at 35, 572 N.E.2d at 339-40), the court did not abuse its dis­cre­tion in re­fus­ing to allow OC to elic­

it Dr. Zia's opin­ion.  See 
Boatmen's
, 155 Ill. 2d at 314, 614 N.E.2d at 1198-99.

2. 
Cards
 
and
 
Letters

OC argues the admission of the cards and letters was cumulative to the plaintiff's and decedent's son's tes­ti­mony and family photographs already admitted as evi­dence.  Thus, the only purpose of their admission was to inflame the pas­sions of the jury.  Plaintiff contends OC failed to object at trial to the ad­mission of the cards and let­ters; there­fore, it forfeit­ed the right to appeal the issue.  See 
Illi­nois State Toll High­way Au­thority v. Heritage Stan­dard Bank & Trust Co.
, 163 Ill. 2d 498, 502, 645 N.E.2d 896, 898 (1994).

Here, OC did object to admission of the cards and let­ters at trial, but failed, at trial and on appeal, to as­sert any jus­ti­fi­ca­

tion for finding the cards and letters in­flam­matory.  The cards and letters con­tain ex­pres­sions of love and friend­ship be­tween dece­dent and plain­tiff.  Because dece­dent was un­able to testify in person, the cards and let­ters pro­vide evi­dence of his relationship with his wife.  This evi­dence is rele­vant to plaintiff's loss of consor­tium claim.  The court did not abuse its dis­cre­tion in admit­ting this evi­dence.

III. CONCLUSION

For the reasons stated, we affirm the trial court's judg­ment.

Affirmed.

STEIGMANN and GARMAN, JJ., concur.